**AMERICAN TRUCKING ASSOCIA-TIONS, INC., et al., Petitioners,**

v.

**INTERSTATE COMMERCE COMMIS-SION and the United States of America, Respondents.**

**No. 81–4026.**

United States Court of Appeals, Fifth Circuit.*

Unit A

Oct. 1, 1981.

As Corrected on Denial of Rehearing Oct. 23, 1981.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Robert J. Grady, ICC, Kenneth P. Kolson, Robert B. Nicholson, Appellate Section, Antitrust Div., Dept. of Justice, Richard A. Allen, ICC, Washington, D. C., for respondents.

Serby & Mitchell, P. C., Atlanta, Ga., for Brannan, Owen, Refrigerated.

Brooks & Matthews, Hugh T. Matthews, Dallas, Tex., for Steere.

Perry, Crockett, Morrison & Starling, Donald B. Morrison, Jackson, Miss., for Merchants.

Nelson J. Cooney, Gen. Counsel, Alan J. Thiemann, William H. Shawn, Washington, D. C., for American Trucking, Red Arrow, Merchants and Steere.

Robinson, Felts, Starnes & Latting, P. C., Phillip Robinson, Austin, Tex., for Central, Great Western, Miller and Saia.

Phinney, Hallman, Pulley & Coke, Leroy Hallman, Dallas, Tex., for Frozen and Southwestern.

Alan F. Wohlstetter, Washington, D. C., for Aero Mayflower et al.

Todd A. Peterman, Washington, D. C., for American Movers Conference.

James M. Doherty, Austin, Tex., for Moss Trucking Co.

Alan E. Serby, Atlanta, Ga., for Brannan, Owen, Refrigerated and Motor Carrier Lawyers Assoc.

Keith G. O'Brien, Edward K. Wheeler, Washington, D. C., for International Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers.

Eugene C. Ewald, Bloomfield Hills, Mich., for National Auto. Transporters.

Before RUBIN, RANDALL and TATE, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

Responding promptly to the enactment of the Motor Carrier Act of 1980, the Interstate Commerce Commission adopted rules and a policy statement dealing with applications to broaden the definition of commodities that could be carried and the territory that could be served by carriers under existing operating authorities. In addition, the Commission issued a policy statement dealing with grants of operating authority to new applicants. These ICC actions are challenged by the trade associations whose members are affected, a union whose members drive the trucks operated by carriers affected by the changes, and by a number of individual firms.[1]

The adversarial process leads to the positioning of counsel at extremes. Those who object to the Commission's two pronouncements attack them as total arrogations of legislative authority. The Commission, however, defends every line of its attempt to frame a new transportation policy. Cognizant of the statute's generality, the scope of the two statements, and the importance of the new policy to the industry, its employees, and the national economy, we have not attempted to assess these two statements on the broad all-or-nothing basis urged by advocates doing no more than what they perceive to be their appointed role; instead we have measured the specifics of the statements against the statute, taking always into account the deference due the Commission as a result both of its experience and the congressional delegation of authority to it.

After full review of the Commission's actions, we conclude that its procedural rules conform to the requirements of the Administrative Procedure Act, that its policy statements are rules clad in advisory garb, and that some of these rules lie within the Commission's discretion but others transgress its statutory mandate. We, therefore, remand to permit the Commission to enact rules that do not exceed the statutory bounds. Because of the length of this opinion, we set forth an outline in the footnote to facilitate reference to parts of the opinion.[2]

1. Exclusive jurisdiction to review an ICC rule, regulation or order is in the Court of Appeals. 28 U.S.C.A. §§ 2321(a), 2342(5) (1978 & West Supp. 1981). *See id.* § 2344 (review of orders).

2. I. THE MOTOR CARRIER ACT OF 1980 page 457

 1.1 LEGISLATIVE BACKGROUND page 457

 1.2 INTERPRETATION OF THE M.C. ACT page 458

 II. RESTRICTION REMOVAL page 459
 2.1 STATUTORY FRAMEWORK page 459
 2.2 RESTRICTION REMOVAL STATEMENT: APPLICATION PROCEDURE page 460

 2.3 COMMODITIES page 461

 2.3.1 Bulk Service page 465

 2.3.2 Household Goods page 465

 2.4 TERRITORY page 468

III. NEW CERTIFICATES page 468

 3.1 STATUTORY FRAMEWORK page 468

 3.2 NEW CERTIFICATES STATEMENT: POLICY OR RULE page 471

 3.3 COMMODITIES page 472

 3.3.1 Bulk Service page 472

 3.3.2 Household Goods page 473

 3.4 TERRITORY page 473

 3.5 PUBLIC NEED page 474

 3.6 MASTER LICENSING page 475

SUMMARY page 475

## I. THE MOTOR CARRIER ACT OF 1980

█ The Motor Carrier Act of 1980 [3] became effective on July 1, 1980. After notice and opportunity for comment the Commission issued a policy statement entitled "Acceptable Forms of Requests for Operating Authority," [4] relating entirely to new applications for authority. Ex Parte No. 55 (Sub-No. 43A). [5] On the same day, the Commission announced rules and guidelines for filing restriction removal applications. "Removal of Restrictions From Authorities of Motor Carriers of Property," Ex Parte No. MC–142 (Sub-No. 1). [6] For convenience we will refer to the policy statement concerning new applications as the New Certificate Statement, and to the rules and guidelines for removing restrictions from existing certificates as the Restriction Removal Statement.

The attacks on these announcements have two major predicates: the ICC exceeded its statutory authority by requiring or permitting carriers to obtain overly broad operating authority, and the Commission's announcements, whether rules or policy statements, were promulgated in violation of the Administrative Procedure Act, 5 U.S.C. § 500, et seq. To understand these challenges, it is necessary to review the legislative background.

## 1.1 LEGISLATIVE BACKGROUND

Before 1935, the Supreme Court had held that the Commerce Clause barred the states from requiring licenses for interstate motor carriage [7] except for safety purposes. [8] By the time of the depression, the trucking industry was described as anarchic, beset by cut-throat competition, and infested by operators who lacked training, finances, and scruples. The depression accentuated the problem with cheap labor, trucks, and fuel available for new ventures. Many states, carriers, customers, and political observers, therefore, sought federal regulation of interstate motor carriers. [9]

The Motor Carrier Act of 1935 [10] was designed to bring stability to the industry under the "restraining hand" of the federal government [11] by requiring carriers to obtain licenses—certificates of public convenience and necessity for common carriers and permits for contract carriers—as conditions precedent to instituting any service. The federal government could thus control the number of competing carriers and would have continuing jurisdiction over them to insure that they provided safe and responsive service. *See United States v. Drum*, 368 U.S. 370, 374–375, 82 S.Ct. 408, 410–11, 7 L.Ed.2d 360, 363–64 (1962).

---

3. Pub.L.No.96–296, 94 Stat. 793 (1980) (hereafter cited as the Motor Carrier Act).

4. The statement covered both certificates to operate as a common carrier and permits to operate as a contract carrier. Common carriers include those who carry general freight, specialized goods and household goods. Contract carriers (defined in 49 U.S.C.A. § 10102(13)) enter into continuing contracts with particular shippers and provide service and equipment to meet those special needs. H.Rep.No.1069, 96th Cong., 2d Sess. 2, *reprinted in* [1980] U.S.Code Cong. & Ad.News 2283, 2284. The American Trucking Association directed its arguments to this court to common carrier certificates, but certain intervenors attacked the provisions relating to contract carrier permits as well. Although we refer in this case only to common carrier certificates, the regulations and policy statements concerning contract carrier permits, 49 U.S.C.A. § 10923, are similarly affected by our analysis and conclusions.

5. 45 Fed.Reg. 86,798 (effective Dec. 31, 1980). *See also* the partial dissenting opinion of Com-

missioner Clapp, 46 Fed.Reg. 2,296 (Jan. 8, 1981). The Commission issued notice of this proposed policy statement in the federal register just two days after the Motor Carrier Act became law. 45 Fed.Reg. 45,545 (July 3, 1980).

6. 45 Fed.Reg. 86,747 (effective Dec. 28, 1980). This rulemaking was instituted in September, 1980, by publication of the proposed rules in the Federal Register. 45 Fed.Reg. 61,326 (Sept. 16, 1980).

7. *Buck v. Kuykendall*, 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623 (1925); *George W. Bush & Sons Co. v. Maloy*, 267 U.S. 317, 45 S.Ct. 326, 69 L.Ed. 627 (1925).

8. *Bradley v. Public Utils. Comm'n*, 289 U.S. 92, 53 S.Ct. 577, 77 L.Ed. 1053 (1933).

9. Kauper, State Regulation of Interstate Motor Carriers, 31 Mich.L.Rev. 1097, 1111 (1933).

10. Motor Carrier Act, ch. 498, 49 Stat. 543 (1935).

11. S.Rep.No.482, 74th Cong., 1st Sess. (1935); H.R.Rep.No.1645, 74th Cong., 1st Sess. (1935).

After more than forty years of regulation Congress undertook an intensive study of motor carrier regulation because of the continuing growth of the industry, its development of techniques to deal with regulation, the consequent burgeoning of anticompetitive practices, and the wastefulness of its restrictive operating practices.[12] For more than eighteen months the House Committee on Public Works and Transportation studied what it called "one of the most complex issues" it had ever considered.[13] For more than a year the Senate Committee on Commerce, Science, and Transportation conducted what it described as "one of the most intensive inquiries" it had ever conducted.[14] Both committees recommended the adoption of a new transportation policy. Their recommendations resulted in passage of the Motor Carrier Act.

The Motor Carrier Act was adopted as "part of the continuing effort by Congress to reduce unnecessary regulation by the Federal Government."[15] It declares that the national policy concerning transportation by motor carriers is "to promote competitive and efficient transportation services."[16] The goals of the national transportation policy include "meeting the needs of shippers, receivers, and consumers; allowing price flexibility; encouraging greater efficiency, particularly in the use of fuel; and providing service to small communities."[17] The Act purposely gives the Commission "explicit direction for regulation of the motor carrier industry and well-defined parameters within which it may act pursuant to congressional policy."[18] Furthermore, the statute admonishes the Commission that it "should not attempt to go beyond the powers vested in it by the Interstate Commerce Act and other legislation enacted by Congress."[19] Moreover, "resulting changes should be implemented with the least amount of disruption to the transportation system consistent with the scope of the reforms enacted."[20]

## 1.2 INTERPRETATION OF THE MOTOR CARRIER ACT

■ All of the issues in this case turn on interpretation of the Motor Carrier Act. The parties impart different meanings to even its clearest terms and buttress the nuances they find by resorting to legislative history. Here, as in every case involving

12. The Motor Carrier Act of 1980 was passed to revise the outdated federal regulation of the motor carrier industry. Motor Carrier Act, *supra* note 3, at § 3 (also at 49 U.S.C.A. § 10101 note (West Supp.1981)). Congress noted the evils the Motor Carrier Act was designed to correct: "[H]istorically the existing regulatory structure has tended in certain circumstances to inhibit market entry, carrier growth, maximum utilization of equipment and energy resources, and opportunities for minorities and others to enter the trucking industry; that protective regulation has resulted in some operating inefficiencies and some anticompetitive pricing." *Id.*

13. H.R.Rep.No.1069, 96th Cong., 2d Sess. 1, *reprinted in* [1980] U.S.Code Cong. & Ad.News 2283.

14. S.Rep.No.641, 96th Cong., 2d Sess. 2 (1980).

15. Motor Carrier Act, *supra* note 3, at § 2 (also at 49 U.S.C.A. § 10101 note (West Supp.1981)).

16. Motor Carrier Act, *supra* note 3, at § 4 (codified at 49 U.S.C.A. § 10101(a)(7) (West Supp.1981)). The national transportation policy dealing with motor carriers is stated in 49 U.S.C. § 10101:

(7) with respect to transportation of property by motor carrier, to promote competitive and efficient transportation services in order to (A) meet the needs of shippers, receivers, and consumers; (B) allow a variety of quality and price options to meet changing market demands and the diverse requirements of the shipping public; (C) allow the most productive use of equipment and energy resources; (D) enable efficient and well-managed carriers to earn adequate profits, attract capital, and maintain fair wages and working conditions; (E) provide and maintain service to small communities and small shippers; (F) improve and maintain a sound, safe, and competitive privately-owned motor carrier system; (G) promote greater participation by minorities in the motor carrier system; and (H) promote intermodal transportation.

17. H.R.Rep.No.1069, *supra* note 13, at 3, *reprinted in* [1980] U.S.Code Cong. & Ad.News, at 2285.

18. Motor Carrier Act, *supra* note 3, at § 3.

19. *Id.*

20. *Id.*

statutory construction, the starting point is the language of the statute itself. *Greyhound Corp. v. Mt. Hood Stages, Inc.*, 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239, 246 (1978). If the statutory words are clear, there is neither need nor warrant to look elsewhere. *Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 492, 67 S.Ct. 789, 793, 91 L.Ed. 1040, 1050 (1947); *Glenn v. United States*, 571 F.2d 270, 271 (5th Cir. 1978). Congress adopted and the President signed only the act itself. The reports of committees and the congressional debates did not become law. A court should depart from the official text of the statute and seek extrinsic aids to its meaning only if the language is not clear, *United States v. Missouri Pac. R.R. Co.*, 278 U.S. 269, 278, 49 S.Ct. 133, 136, 73 L.Ed. 322, 376–77 (1929), or if apparent clarity of language leads to absurdity of result when applied, *United States v. American Trucking Ass'ns*, 310 U.S. 534, 543–544, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345, 1350–51 (1940).

The need for caution in relying on legislative commentary is exemplified by the legislative history of this Act. The House and the Senate Bills differed significantly. The final statute reflects in most respects the provisions of the House Bill, but, in the debate that preceded final passage, various members of each house attributed different meanings to its provisions. In some instances, these remarks were made after the committees of each house had reported, in an effort designed apparently to impress constituents or influence judicial interpreta-

tion, rather than advocate passage, for the remarks were merely inserted into the Congressional Record.[21] The legislative debate, therefore, is both a conflicting and an unreliable guide to congressional purpose, for on most of the issues of statutory purpose involved here, authority can be found to favor any of several interpretations. We rely, therefore, on the statutory language, influenced, when its mandate is not clear, by reports of the Senate and House Committees.

■ There is no doubt that the Motor Carrier Act, while continuing the policy of industry regulation, was designed to change the Commission's authority and the operating practices of the industry. Congress desired to reduce, but not to eliminate regulation.[22] The statute gives the Commission new directions and requires it to implement new policies. The two Commission promulgations responded to the statutory mandate to replace narrow, highly specific certificates with broader provisions. We consider whether its rules and guidelines are within the wide discretion imparted to it by the statute, or whether, on the other hand, they exceed or transgress the congressional mandate. In doing so, we consider not only the Commission's statements but also its implementing actions, for the true test of the word is the deed.[23]

## II. RESTRICTION REMOVAL

### 2.1 STATUTORY FRAMEWORK

Section 6 of the Motor Carrier Act deals with the removal of operating restrictions

---

**21.** 126 Cong.Rec. S8,480 (daily ed. June 16, 1980) (Statement of Senator Bayh: "It is my understanding, however, that the colloquys did not actually take place. Rather, these statements were inserted in the *Record* as though read.").

**22.** H.R.Rep.No.1069, *supra* note 13, at 3, reprinted in [1980] U.S.Code Cong. & Ad.News, at 2285; S.Rep.No.641, *supra* note 14, at 1–2 ("The bill represents a middle ground between continuing the status quo, on the one hand, and total deregulation on the other hand.").

**23.** "[T]he duty of a reviewing court [is] to determine whether the course followed by the Commission is consistent with its mandate from Congress." *Atchison, T. & S.F. Ry. Co. v.*

*Wichita Bd. of Trade*, 412 U.S. 800, 806, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350, 361 (1973). In each of the following cases, the court, in evaluating a challenge to a statute or regulation, considered the actual agency practice under the challenged provision. *American Bus Ass'n v. United States*, 627 F.2d 525, 530 (D.C. Cir.1980); *Citizens Communications Center v. Federal Communication Comm'n*, 447 F.2d 1201, 1206 (D.C.Cir.1971) (that the policy statement "has *in fact* served to deter the filing of a single competing application . . . in over a year is perhaps the most compelling factor in the court's decision to review this dispute at this time" (emphasis supplied)); *see also Morton v. Ruiz*, 415 U.S. 199, 213, 94 S.Ct. 1055, 1063, 39 L.Ed.2d 270, 281 (1974).

from existing certificates.[24] Congress believed that many of these restrictions served little or no public purpose; they often resulted in operating inefficiencies and wasted fuel because carriers frequently were prevented from providing service by way of the most direct routes and were required to travel circuitous routes or by way of "gateways." In addition, carriers were sometimes subject to "excessively narrow limitations" on the types of commodities they could transport and the territories they could serve. They were prohibited from serving intermediate points on their routes or required to return empty to their originating points because they had only one-way authority to certain markets.[25] Congress, therefore, required the Commission to eliminate gateway restrictions and circuitous route limitations within 180 days, to permit carriers to offer service to intermediate points, to provide round-trip authority, and, in addition, to "implement, *by regulation*, procedures to process expedi-

tiously applications of individual motor carriers ... seeking removal of operating restrictions in order to ... *reasonably broaden* the categories of property authorized by the carrier's certificate or permit," and to "eliminate *unreasonable or excessively narrow* territorial limitations."[26]

## 2.2 RESTRICTION REMOVAL STATEMENT: APPLICATION PROCEDURE

The Restriction Removal Statement contains three parts: general background information, *rules* to govern the restriction removal procedure, and *guidelines* for applicants for restriction removal.[27] The restriction removal procedure requires that notice of the application for restriction removal be published in the Federal Register.[28] Written comments by interested persons may then be filed with the Commission within twenty-five days.[29] The Commission will consider the application itself and any written comments received. There will be "neither oral hearings nor the opportunity for

---

**24.** The full text of this section, 49 U.S.C.A. § 10922(h)(1) (West Supp.1981), is:

(h)(1) Not later than 180 days after the date of enactment of this subsection, the Commission shall—

(A) eliminate gateway restrictions and circuitous route limitations imposed upon motor common carriers of property; and

(B) implement, by regulation, procedures to process expeditiously applications of individual motor carriers of property seeking removal of operating restrictions in order to—

(i) reasonably broaden the categories of property authorized by the carrier's certificate or permit;

(ii) authorize transportation or service to intermediate points on the carrier's routes;

(iii) provide round-trip authority where only one-way authority exists;

(iv) eliminate unreasonable or excessively narrow territorial limitations; or

(v) eliminate any other unreasonable restriction that the Commission deems to be wasteful of fuel, inefficient, or contrary to the public interest.

(2) The regulations promulgated by the Commission pursuant to paragraph (1)(B) of this subsection shall provide for final Commission action upon an application not later than 120 days after the date the application is filed with the Commission, except that in extraordinary circumstances, the Commission may extend such deadline for a period of not to exceed 90 additional days. Such regulations shall also provide for notice and the opportu-

nity for interested parties to comment, but need not provide for oral evidentiary hearings. In granting or denying applications under paragraph (1)(B) of this subsection, the Commission shall (A) consider, among other things, the impact of the proposed restriction removal upon the consumption of energy resources, potential cost savings and improved efficiency, and the transportation policy set forth in section 10101(a) of this title, and (B) give special consideration to providing and maintaining service to small and rural communities and small shippers.

**25.** H.R.Rep.No.1069, *supra* note 13, at 17–18, *reprinted in* [1980] U.S.Code Cong. & Ad.News, at 2299–2300; *see* S.Rep.No.641, *supra* note 14, at 7.

**26.** 49 U.S.C.A. § 10922(h)(1)(B) (emphasis supplied).

**27.** The general background information is found at 45 Fed.Reg. 86,747–57 (1980). The rules are found in *id.* at 86,757–59 (to be codified in 49 C.F.R. §§ 1002, 1137.1–1137.15). The "*Guidelines* for Determining Applications" are found in *id.* at 86,759–60 (to be codified in 49 C.F.R. § 1137.20–.29) (emphasis supplied).

**28.** *Id.* at 86,758 (1980) (to be codified in 49 C.F.R. § 1137.11).

**29.** *Id.* (to be codified in 49 C.F.R. § 1137.12).

the submission of evidence under modified procedure." [30] In January 1981, the Commission established the Special Restriction Removal Employee Board to which it delegated the initial decision-making function on restriction removal applications. [31]

■ This procedure does not violate the requirements of the Administrative Procedure Act (APA). A formal adversary proceeding on the record, as specified in APA sections 554, 556, and 557, [32] is not required. The Motor Carrier Act states that the regulations to be adopted must "provide for notice and the opportunity for interested parties to comment, *but need not provide for oral evidentiary hearings.*" 49 U.S.C. § 10922(h)(2) (emphasis supplied). The dispensation of oral hearings does not imply a requirement of evidentiary hearings based on written submissions. The Commission correctly observed: "the terms of the statute call for informal adjudicatory procedures of the type ordinarily employed in rulemaking proceedings, rather than procedures used in conventional adversary licensing proceedings." [33] This does not dispense with adjudication: it expressly requires informal adjudicatory procedures but analogizes the process of submitting applications and opposing statements to the procedure used in rulemaking.

The Commission's interpretation is undoubtedly influenced by the time constraints placed on it by the statute. The Act specifically instructs the Commission to dispose quickly of restriction removal applications, and requires "final Commission action upon an application not later than 120 days after the date the application is filed" except in extraordinary circumstances. [34] Because there are now some 20,000 carriers holding approximately 500,000 certificates,

the number of applications for restriction removal may be tremendous. The Commission must devise procedures to perform the task imposed on it within the time allowed.

■ Further, the procedure devised by the Commission is consistent with general principles of administrative law. In the absence of "constitutional constraints or extremely compelling circumstances," administrative agencies should be free to devise their own rules of procedure and methods of inquiry designed to help them discharge their multitudinous duties. *Vermont Yankee Nuclear Power Co. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460, 479 (1978). [35] The procedural rules formulated by the Commission provide notice and an opportunity to be heard by written comment. It appears to afford at least the minimum procedural rights expressed in the Act. *See Vermont Yankee,* 435 U.S. at 545–49, 98 S.Ct. at 1212–1214, 55 L.Ed.2d at 480–82.

While it is possible that the Commission could, under the Restriction Removal procedure, unduly abridge a party's procedural rights in a particular case, we are not now presented with such a situation. We, therefore, decline to hypothesize such possible consequences of the rules should they be so applied. *See American Trucking Ass'ns, Inc. v. United States,* 627 F.2d 1313, 1318, 1327 (D.C.Cir.1980).

### 2.3 COMMODITIES

The Motor Carrier Act requires the Commission to establish a procedure, on application of individual motor carriers, "to *reasonably* broaden the categories of property authorized." 49 U.S.C.A. § 10922(h)(1) (emphasis supplied). Much is, therefore, entrusted to Commission discretion. After

---

30. *Id.* (to be codified in 49 C.F.R. § 1137.14(a)).

31. 46 Fed.Reg. 3,532 (1981) (to be codified in 49 C.F.R. § 1011.6(1)).

32. 5 U.S.C. §§ 554, 556, 557.

33. 45 Fed.Reg. 86,747, 86,749 (1980).

34. 49 U.S.C.A. § 10922(h)(2) (West Supp.1981).

35. *See also American Farm Lines v. Black Ball Freight Serv.,* 397 U.S. 532, 539, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547, 553 (1970) (an administrative agency may mold its procedural rules for the orderly transaction of business in the manner required to achieve justice in a given case, and such action is not reviewable unless the complaining party makes a showing of substantial prejudice).

forty-five years of regulatory experience, the Commission is presumably qualified to determine the appropriate breadth of the categories. Yet the statute does limit the broadening to what is reasonable. This fetters the Commission's discretion and exacts judicial review to determine whether its action is reasonable.

What the Commission considers a "reasonable" broadening of commodities descriptions is described in the second part of the Restriction Removal Statement labeled "Guidelines."[36] Carriers presently holding authority to transport one or more specifically named commodities or a limited class of commodities may broaden their authority to permit them to transport the entire class or classes of commodities of which the named commodity constitutes part.[37] The applicable class must, however, be chosen by the carrier from one of three different sources.[38]

This requirement makes it likely that a carrier with authority to transport only one commodity who desires to transport only one additional commodity would be required to seek authority for an entire class of commodities, some of which the carrier may not wish to transport or may lack the ability to transport. Responding to the concern expressed by those opposing adoption of these procedures that, in the consideration both of applications for removal of restrictions and of those for new operating authority, the certificates might authorize service that the carrier is unable or unwilling to provide, the Commission issued a notice of proposed rulemaking expressly dealing with "the interaction of broad certificate grants with the perception that a common carrier's holding out must inevitably be defined by the authority contained in the carrier's certificate."[39] The Commission also denied the administrative

petitions of household goods movers, represented by the American Movers Conference, seeking to retain the restriction imposed prior to 1980 excluding authority to transport household goods from certificates granting general comodities authorities.

The Commission contends that the portion of its restriction removal statement labelled "guidelines" states only Commission policy and that judicial review is limited to determining whether these guidelines appear, on facial examination, to be rational and within the Commission's statutory authority, without regard to how they are applied. It urges that the petitioners' argument that these will result in grants of overly broad authority are speculative and premature.

The delegation of power to administrative agencies is essential to the implementation of legislative policy in a complex society. Yet Congress knew that governors must themselves be governed and regulators regulated. Congress therefore required an administrative agency to follow specific procedures in adopting regulatory rules. It exempted from these procedures, however, general policy statements designed to inform rather than to control. For this reason, the APA itself draws a distinction between rules and guidelines. The APA requires all agencies to conform to its requirements in promulgating rules, but excepts "interpretative rules" and "general statements of policy" from these requirements. 5 U.S.C. § 553(b)(3)(A). The APA, however, does not otherwise describe the characteristics of each classification. Therefore, the difficulty of discerning the distinction is patent, and it is exaggerated when the effect of the promulgation may be masked by the choice of words used to describe it.[40]

---

36. 45 Fed.Reg. 86,747, 86,759 (1980).

37. *Id.* (to be codified in 49 C.F.R. § 1137.21(b)).

38. *See* page 463 *infra.*

39. Ex Parte No. MC–77 (Sub-No. 3), 46 Fed. Reg. 8,604 (1981) (as amended *id.* at 13,751) (to be codified in 49 C.F.R. § 1310); *id.* at 44,482 (supplemental notice of proposed rulemaking).

40. "[T]he distinction between a rule . . ., which must be published and a 'general statement of policy,' which is not defined in the [APA], is enshrouded in considerable smog." *Noel v. Chapman*, 508 F.2d 1023, 1029–30 (2d Cir. 1975), *cert. denied*, 423 U.S. 824, 96 S.Ct. 37, 46

■ There are two criteria for differentiating rules from guidelines. These were considered by the court in *American Bus Ass'n v. United States*, 627 F.2d 525 (D.C. Cir.1980), in an analysis with which we agree. A policy statement is in reality a binding norm (a rule) unless (1) it acts only prospectively, and (2) it "genuinely leaves the agency and its decision-makers free to exercise discretion." [41] The first criterion needs no further discussion and is met by the Commission's Restriction Removal Statement.[42] In applying the second, we look to the language of the Restriction Removal Statement and the manner in which the agency actually applies it.

The "Guidelines for Determining [Restriction Removal] Applications" [43] contains an introductory statement that the guidelines are "designed to assist applicants in filing applications" and are not intended to prejudge any individual application.[44] Yet there are sinews of command beneath the velvet words of the subsequent sections of the guidelines. For instance, for the general commodities carrier, any commodities restrictions except those concerning explosives "are considered unduly restrictive."[45] Authority to transport one or more named commodities or a limited class of commodities is considered unduly restrictive but, if the commodities classification is broadened, the redefinition must conform either to one of the twenty-nine categories of the Standard Transportation Commodities Code (STCC),[46] the commodities definitions set forth in *Descriptions in Motor Carrier Certificates*, 61 M.C.C. 209 (1952) and 766 (1953), or to any other broader class description previously recognized by the Commission.[47] Neither two named commodities nor part of an STCC class will be considered sufficiently broad. These specifics, which are the only ones dealing with broadening of commodity authority, are couched in terms of command.[48]

■ The guidelines read as a whole, are not merely an announcement that, considering both the volume of applications and the limited time within which they must be processed, simple broad descriptions are favored. Instead, decorated with words that appear to be carefully chosen to avert classification as rules, they lead all applicants toward one course—the use of the categories designated by the Commission. The manner of dealing with applicants who do not follow what is declared to be the "normal" course demonstrates graphically that the carrier who does not

L.Ed.2d 40 (1975). "[T]he problem is baffling. The statute is unclear, and its legislative history helps hardly at all." 2 K. Davis, Administrative Law Treatise § 7:5, at 32 (2d ed. 1979).

**41.** *American Bus Ass'n v. United States*, 627 F.2d 525, 529 (D.C.Cir.1980). *See also Guardian Fed. Sav. & Loan Assoc. v. Federal Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666 (D.C.Cir. 1978); *Pacific Gas & Elec. Co. v. Federal Power Comm'n*, 506 F.2d 33, 38 (D.C.Cir.1974).

**42.** The new certificate statement is prospective even if the Commission applies it to pending cases. *See Pacific Molasses Co. v. FTC*, 356 F.2d 386, 390 n.11 (5th Cir. 1966) ("New procedural rules published by an agency may be made to apply to pending proceedings . . . and also retroactively if injury or prejudice does not result therefrom.").

**43.** 45 Fed.Reg. 86,747, 86,759–60 (1980) (to be codified in 49 C.F.R. § 1137.20–.29).

**44.** *Id.* at 86,759 (to be codified in 49 C.F.R. § 1137.20).

**45.** *Id.* (to be codified in 49 C.F.R. § 1137.21(a)).

**46.** The modified list of twenty-nine STCC classifications may be found in Appendix A of "Acceptable Forms of Requests for Operating Authority, Ex Parte 55 (Sub.-No. 43A)," 45 Fed. Reg. 86,798, 86,807 (1980).

**47.** 45 Fed.Reg. 86,747, 86,759 (to be codified in 49 C.F.R. § 1137.21(b)).

**48.** When, as here, the regulations are . . . couched in terms of command and accompanied by an announcement of the Commission that the policy is one "which we will follow in exercising our licensing power," they must be taken by those entitled to rely upon them as what they purport to be—an exercise of this delegated legislative power—which, until amended, are controlling alike upon the Commission and all others whose rights may be affected by the Commission's execution of them.
*Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 422, 62 S.Ct. 1194, 1202, 86 L.Ed. 1563, 1573 (1942).

conform will incur both delay and potentially vast litigation expense. The threat of these, as the Commission itself declares elsewhere in the statement, was used by the industry as a means to develop its straitened channel of narrow authority. Confronted with the threat of opposition by other carriers, applicants considered it prudent to narrow their requests rather than to litigate the full scope of the authority sought. The guidelines provide a similar channeling. As a result, these are not guidelines but normative rules,[49] and must be evaluated as such.[50]

The Commission's broadening of commodities classifications must be reasonable, but the statute provides no guide for determining the quality of reasonableness. The very use of this broad qualitative measure indicates that the effort to redefine it may result only in semantic rephrasings of the problem. "Reasonable" implies that the broadening must be rational, logically supportable and fair. Moreover, the requirement that the broadening be reasonable is not merely a stricture on the Commission. In order to achieve the purposes of the Motor Carrier Act, the Commission may also interpret the term "reasonable" to require those carriers who seek a removal of an unreasonably narrow limitation to suggest another that will not also be unreasonably straightened albeit slightly wider than the preceding definition.

To find the standard by which the Commission should balance the objectives of promoting competition, limiting regulation, and yet not unreasonably broadening commodities grants, we seek guidance first from the other provisions of the Motor Carrier Act rather than dictionaries and legislative reports. In mandating the removal of unreasonable restrictions, the statute does not dispense with the primary requirement that every carrier be "fit, willing, and able to provide the transportation to be authorized by the certificate."[51] The removal of existing restrictions is to result from the voluntary application of the carrier to the Commission, not from the Commission's fiat.[52]

■ Because the statute gives the Commission discretion to deny applications for inconsequential expansion, we cannot say that its use of the STCC classification basis or that either of the other two broad commodity descriptions it has approved is an unreasonable starting point. Each of the twenty-nine STCC classifications lists commodities that appear to be generally related.[53] The other broad commodity definitions. likewise appear to encompass goods with related characteristics.

The difficulty lies not in the suggestion that these broad descriptions be used when appropriate but in the constraint that every applicant seek equally broad authority. Because the carrier's action in seeking restriction removal is voluntary, and the carrier must be fit, willing, and able, it is not reasonable to require only these classifications or others at least as broad. Within some of these classifications may lurk commodities unrelated to each other or requiring different types of service. The carrier must be permitted, both by the Commission's express statement and actual agency practice, to seek some other commodity

---

49. *See Brown Express, Inc. v. United States*, 607 F.2d 695, 701 (5th Cir. 1979) ("An announcement stating a change in the method by which an agency will grant substantive rights is not a 'general statement of policy.'").

50. When Congress gives an administrative agency the primary responsibility for interpreting a statutory term, the reviewing court may not set aside the regulations promulgated by the agency just because it would have interpreted the term in a different manner. *Batterton v. Francis*, 432 U.S. 416, 425–26, 97 S.Ct. 2399, 2405–06, 53 L.Ed.2d 448, [45–57] (1977). The regulations "can be set aside only if [the

agency] exceeded [its] statutory authority or if the regulation is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* In this case we find that the Commission exceeded its statutory authority. *See infra.*

51. 49 U.S.C.A. § 10922(a)(1)(A) (West Supp. 1981).

52. *Id.* § 10922(h)(1)(B)(i).

53. *See* note 46 *supra.*

classification if it can show that use of the tripartite Commission standard would require the transportation of commodities unrelated to those previously authorized or would require the institution of a different type of service, and that the carrier is not fit or is unwilling or is unable to provide the service. The procedure for seeking such a modification must be reasonably flexible so that applications will neither be arbitrarily prejudged nor condemned to excessive expense. Finally, there must be some opportunity for opposition to an application to be voiced. Opportunities for either applicants or opponents to seek variation from the mandated broad categories is further minimized by the elimination of evidentiary submissions.

The Commission did not choose to cast its action in the form of an administrative presumption that a carrier fit, willing and able to transport two commodities in a given class had equal competence and desire to transport all others that might be embraced. Presumably aware that such a presumption went beyond either business reality or its statutory powers, it has instead put each applicant into the commission's mold while merely professing to allow opportunity for deviation.

With regard to commodity descriptions in restriction removal, the comments of Commissioner Clapp, dissenting in part from the New Certificate Statement are worthy of Commission consideration. "[C]arriers and shippers must be able to make their own business judgments as to the sector of the marketplace in which they are willing and able to participate. A decision to allow carriers some discretion in commodity

choices is *not* restrictive, it is common sense." [54]

### 2.3.1 Bulk Service

▮ In acting on Restriction Removal applications, the Commission considers restrictions on the authority to carry general commodities, including bulk service restrictions with the exception only of class A and B explosives, to be "unduly restrictive" and provides that they "may normally be removed under these procedures." [55] This provision clearly exceeds the Commission's authority to "*reasonably broaden* the categories of property authorized by the carrier's certificate or permit." [56] By stating that it will *routinely grant authority* to carry bulk commodities to all applicants requesting general commodities authority,[57] the Commission has exceeded its statutory duty to issue a certificate only to persons "fit, willing, and able to provide the transportation to be authorized by the certificate." [58] Bulk commodities are typically transported in tank trucks, and it is conceivable that many of the applicants for general commodities authority under the restriction removal procedures will not even possess the equipment necessary to transport the commodities authorized by the certificate.[59]

### 2.3.2 Household Goods

When the Restriction Removal Statement was first announced, the guidelines proposed that "[w]here a carrier is authorized to transport general commodities, restrictions having the effect of precluding the transportation of household goods ... are *not* considered unduly restrictive and are

---

**54.** 46 Fed.Reg. 2,296, 2,296 (1981) (commenting on broadening of authorities for new applications).

**55.** 45 Fed.Reg. 86,747, 86,759 (1980) (to be codified in 49 C.F.R. § 1137.21(a)).

**56.** 49 U.S.C.A. § 10922(h)(1)(B)(i) (emphasis supplied).

**57.** In fact, the Commission has granted bulk service authority in several restriction removal cases that are pending review by this circuit. *See, e.g., Steere Tank Lines, Inc. v. ICC, appeal docketed*, No. 81–4169 (5th Cir. May 11, 1981);

*Steere Tank Lines, Inc. v. ICC, appeal docketed*, No. 81–4083 (5th Cir. Mar. 9, 1981).

**58.** 49 U.S.C.A. § 10922(b)(1)(A).

**59.** Indeed, the Commission explicitly stated that "[r]estrictions which require or preclude the use of a specific type of equipment, such as 'in tank vehicles'" are "contrary to the public interest and should be removed via the restriction removal procedure." 45 Fed.Reg. 86,747, 86,759 (1980) (to be codified in 49 C.F.R. § 1137.25(a)).

not normally subject to removal under these procedures."[60] This was consistent with the Commission's prior practice of excluding household goods from general commodities authority. The Commission's treatment of household goods as a distinct transportation specialty originated more than forty years ago.[61] The guidelines adopted, however, eliminated the provision excepting household goods from general commodities authority,[62] and inferentially classified such an exception as unduly restrictive. The explanation given by the Commission for the change was simply that there was no reason to treat household goods differently from other general commodities, and that the original proposal had been based only on the fact that, when it was made, "we were concerned that the pending Household Goods Act of 1980, would establish an exclusive licensing category for household goods."[63]

The same Congress that adopted the Motor Carrier Act adopted the Household Goods Transportation Act.[64] This Act amended the provisions of the Interstate Commerce Act by providing, for the first time, a specific statutory definition for "household goods," the only commodity defined in the Interstate Commerce Act. 49 U.S.C.A. § 10102(10). Congress also gave the Commission authority to expand that definition to include "such other similar property" as it might provide by regula-

tion. *Id.* The House Report commented, however,

> it is not the intent of the Committee to authorize the Commission to alter this definition with unlimited discretion. In addition, the Committee expects that any proposal to expand the definition be subject to rulemaking procedures which provide for notice and opportunity for comment by interested parties before the Commission acts to grant or to deny such change.[65]

This indicates Congress understood the term "similar property" to be restrictive.[66]

The other provisions of the Household Goods Transportation Act further evince Congressional concern that consumers be protected in contracting for the carriage of household goods.[67] Congress made special provision for regulation of the acts of household goods agents, 49 U.S.C.A. § 10934, and for regulation of household goods carrier operations, *id.* § 11110. Congress provided a separate dispute settlement program for household goods carriers, *id.* § 11711, and specifically excepted violations relating to the transportation of household goods from the penalties provision of *id.* § 11901(g). If every general commodities carrier is ipso facto licensed to carry household goods, the Commission would be deprived of the practical ability to enforce its obligations to the public imposed by these special provisions.

---

**60.** 45 Fed.Reg. 61,326 (1980) (proposed 49 C.F.R. § 1137.21(a)) (emphasis supplied).

**61.** *See* Classification of Motor Carriers of Property, 2 M.C.C. 703, 709–10 (1937). Congress noted the "unique relationship" of household goods movers to the consumer in the House report on the Motor Carrier Act, and thus, "decided to deal with household goods movers in a separate piece of legislation." H.R.Rep. No.1069, *supra* note 13, at 9, *reprinted in* [1980] U.S.Code Cong. & Ad.News, at 2291.

**62.** 45 Fed.Reg. 86,747, 86,759 (1980) (to be codified in 49 C.F.R. § 1137.21(a)).

**63.** *Id.* at 86,752.

**64.** Pub.L.No.96–454, 94 Stat. 2011 (1980) (codified in 49 U.S.C. §§ 10102(10), 10734, 10934, 11110, 11711, 11901, and 11917).

**65.** H.R.Rep.No.1372, 96th Cong., 2d Sess. 6, *reprinted in* [1980] U.S.Code Cong. & Ad.News, 4,271, 4,276.

**66.** The Commission's notice of proposed rulemaking did not propose to change the household goods exception. This is challenged as inadequate notice of a proposed change that resulted in its elimination. In view of the decision we have reached, we need not assess the tenability of the Commission's position that notice of intention to make no change should warn that a change might be made and alert proponents of the status quo to defend it. We draw attention to the statement quoted in text, however, in connection with any future Commission actions that may ensue from this review.

**67.** H.R.Rep.No.1372, *supra* note 65, at 5–6, *reprinted in* [1980] U.S.Code Cong. & Ad.News, at 4275–76.

In the Motor Carrier Act, Congress recognized that household goods transportation is a separate service from general commodity transportation by excepting household goods from two of the types of authority that can be granted based solely upon a showing of fitness by the applicant: transportation of property for the United States Government, *id.* § 10922(b)(4)(C),[68] and standards governing the entry of property brokers, *id.* § 10924(b).[69] In addition, while general commodity carriers need not obtain Commission approval to establish rates under which their liability to the shipper for loss or damage to the shipment is limited to a value declared by the shipper, the Commission may require that household goods carriers obtain prior express approval from the Commission in order to establish such released rates. *Id.* § 10730(b)(1).

Furthermore, there are patent differences between the service rendered in transporting household goods for the consumer and those provided in carrying general commodities. The Commission observed in its brief to this court that furniture, air conditioners, refrigerators, and all other items that qualify as "household goods" when shipped to or from a residence have always been within the class of "general commodities" when shipped to or from other kinds of places. From the fact that a chair remains a chair whether it has been in someone's living room or whether it has been crated in excelsior and shipped from a manufacturer to a dealer, the Commission concludes that there is nothing in the inherent nature of "household goods" that makes them inappropriate for carriage by a carrier that has long held general commodity authority.

While the nature of the chair or the refrigerator is unchanged by its use, the service rendered in transporting such commodities after they are purchased by a consumer is manifestly different from that required when they are shipped in crates from manufacturer to retailer. The Commission has itself recognized the differences be-

tween the services rendered by household goods and general commodity carriers:

> [Household goods transportation] is a highly specialized and personalized business, and entails to an exceptional degree the necessity of personal contact with the shipper. Generally the individual shipper will not utilize the services of a household-goods carrier more than a few times in his life-time, and the services involve the transportation of his most intimate possessions. Unlike commercial traffic, which is generally prepared and packed for shipment by the shipper and offered to the carrier at a loading dock, household goods require the rendition of numerous accessorial services, such as the careful packing of fragile articles, the crating of mirrors and other items which cannot be transported without special protection, the furnishing of wardrobes for the transportation of unpacked items of clothing, and the protection in transportation of the finished surfaces of furniture.

North American Van Lines, Inc.—Investigation of Control, 60 M.C.C. 701, 723–724 (1955).

 In light of the historical recognition of household goods transportation as a specialized service requiring special equipment and highly trained and skilled workers, as well as the adoption of special regulatory requirements applicable solely to household goods carriers, it is illogical and unreasonable for the Commission to permit any general commodities carrier to perform household goods transportation without any further demonstration of its fitness, willingness, and ability to perform such service.

The Commission urges in final defense of its position that the guidelines do not establish any presumption against seeking authority limited to household goods. This is correct but inconclusive on the issue whether a general commodities carrier may eliminate the restriction against household goods without demonstrating more than its gener-

**68.** Motor Carrier Act, *supra* note 3, at § 5 (excepting only used household goods).

**69.** *Id.* at § 17(a).

al commodities certificate. Such expansion is unreasonable.

## 2.4 TERRITORY

■ The Commission is also, upon carrier application, to "eliminate unreasonable or excessively narrow territorial limitations." 49 U.S.C.A. § 10922(h)(1)(B)(iv). The "guidelines" provide that authorizations to serve a territory less extensive than a county [70] are considered excessively narrow.[71] A carrier whose certificate is so restricted may seek expansion to all points in the county in which any authorized service point is located.[72] If an authorized service point is located within a given city as well as a county, the applicant may seek expansion to the city and its commercial zone.[73]

These standards are appropriately adapted to the elimination of unreasonable territorial limitations. A single point designation such as a particular plant site is obviously unreasonably narrow. What area extending beyond one point is wide enough not to be excessively narrow, yet not so large as to be unreasonably broad, cannot be determined by formula or crow's flight distances. The Statement does contemplate territorial authority broader than typically issued in the past, but the geographic areas it fixes are reasonably bounded and tailored to the purposes of the Act. The Commission has indicated that the county limit is confining and that grants will not be statewide. In its background discussion to the Restriction Removal Statement, it stated:

> Southern Freight Lines, et al., raises the issue of whether a carrier authorized to serve various counties in a State can use these procedures to obtain statewide authority. We believe that such an expansion of authority is outside the scope of restrictions removal. Carriers in such a

position are encouraged to use the normal application procedures to expand and consolidate their authorities.[74]

Counties and cities are easily identifiable. They may be centers for similar industries. As the terminals for interstate motor carriers, they are relatively compact in comparison with the travel distance for the carrier. The decision is reasonable and its selection is well within the Commission's discretion.

## III. NEW CERTIFICATES

### 3.1 STATUTORY FRAMEWORK

The New Certificates Statement commences with an interpretation of the Motor Carrier Act of 1980: "We are to implement these policies in the entry area by granting broad authorities to future applicants and by removing unnecessary burdens on those now operating. This policy statement is designed to accomplish the goal of awarding broad authorities to future applicants." [75] After preliminary discussion, it announces policies pertaining to specific matters. The first is Acceptable Commodity Descriptions. The Commission will "permit applicants to seek authority commensurate with their business requirements so long as the requested authority is not unduly narrow." The only acceptable descriptions, however, are the three kinds of broad categories discussed in connection with restriction removal. The Commission will decline to except bulk commodities and household goods from general commodities descriptions. As to territorial descriptions, the Commission requires future applicants for common carrier irregular-route service to omit gateway restrictions and narrow territorial limitations, and to describe service areas no smaller in size than counties, and states that such carriers will receive

70. "County" means (1) a county in any State, a judicial district in Alaska, and a parish in Louisiana and (2) a city, town, or village in any State which is not administratively part of a county, New York, N. Y., and Washington, D. C. and their commercial zones as defined by the Commission.
45 Fed.Reg. 86,747, 86,757 (1980) (to be codified in 49 C.F.R. § 1137.3(a)).

71. Id. at 86,759 (to be codified in 49 C.F.R. § 1137.24).

72. Id.

73. Id.

74. 45 Fed.Reg. 86,747, 86,753–54 (1980).

75. 45 Fed.Reg. 86,798, 86,798 (1980).

authority to serve points in Alaska and Hawaii as part of an authorization to serve points in the United States. These are the principal provisions attacked.

As we have seen, the Act requires the Commission to remove unnecessary restrictions from existing certificates, but it does not contain a similar explicit statement concerning new applicants. We turn then to the statute itself to determine its implications. The House Report reviewed the efforts of the Commission in the recent past to reevaluate its historic approach to entry standards, and then stated, "[b]road policy decisions of this type should be made by the Congress and should not be left to the discretion of the Commission." [76] The licensing requirements, 49 U.S.C. § 10922(b)(1), were, therefore, amended by the Motor Carrier Act to make it easier for new trucking companies to enter the market.

The statute retains, however, the "traditional test" [77] that a certificate shall be issued "if the Commission finds—that the person is fit, willing, and able to provide the transportation to be authorized by the certificate." [78] The retention of this standard, tested by forty-five years of interpretation, was deliberate.[79] Entry was eased by revising only the "public convenience and necessity requirement [80] to reduce the burden of proof on persons supporting the application." [81]

Under new section 10922(b)(1), once the applicant has made a prima facie showing that the proposed service will serve "a useful public purpose, responsive to a public demand or need," [82] the burden of proof

shifts to persons opposing issuance of the certificate to show that the proposed service is "inconsistent with the public convenience and necessity." [83] The statute "creates a presumption that the grant of the application is consistent with the public convenience and necessity if the applicant demonstrates that the proposed service will serve a useful public purpose." [84]

The terms "fit, willing, and able" convey a clear meaning. Each requirement relates to providing "the transportation to be authorized by the certificate." 49 U.S.C.A. § 10922(b)(1). Regardless of obligations of a common carrier that may be imposed by its status or its holding of a certificate, the statutory test requires that the carrier demonstrate all three attributes as a prerequisite to issuance of the certificate.

We are unable to find support in the statutory language for the Commission's conclusion that it was required, or even authorized, to implement the policies of the Motor Carrier Act by granting to new applicants the very broad authorities it prescribes. The Commission derives its mandate to issue such authority to *new* applicants inferentially from the general policy of the statute to broaden existing certificates. Three reasons were given by the Commission for issuing broad certificates to new applicants. First, "highly restricted authority" compromises overall efficiency, increases fuel use, and prevents carriers from offering service designed to meet the full extent of a shipper's needs or responding promptly to changed market

**76.** H.R.Rep.No.1069, *supra* note 13, at 13, *reprinted in* [1980] U.S.Code Cong. & Ad.News, at 2295. *See also* S.Rep.No.641, *supra* note 14, at 5–6.

**77.** H.R.Rep.No.1069, *supra* note 13, at 14, *reprinted in* [1980] U.S.Code Cong. & Ad.News, at 2296; S.Rep.No.641, *supra* note 14, at 5.

**78.** 49 U.S.C.A. § 10922(b)(1)(A).

**79.** H.R.Rep.No.1069, *supra* note 13, at 14 *reprinted in* [1980] U.S.Code Cong. & Ad.News, at 2296; S.Rep.No.641, *supra* note 14, at 24.

**80.** 49 U.S.C.A. § 10922(b)(1).

**81.** H.R.Rep.No.1069, *supra* note 13, at 14 *reprinted in* [1980] U.S.Code Cong. & Ad.News, at 2296; S.Rep.No.641, *supra* note 14, at 5–6.

**82.** 49 U.S.C.A. § 10922(b)(1).

**83.** *Id.*

**84.** H.R.Rep.No.1069, *supra* note 13, at 15, *reprinted in* [1980] U.S.Code Cong. & Ad.News, at 2297; S.Rep.No.641, *supra* note 14, at 5–6, 24. The statute eliminates any showing of public convenience and necessity for certain services, and retains only the "fit, willing, and able" test. 49 U.S.C.A. § 10922(b)(4).

conditions. Second, restricted authority dulls competition because the time required to obtain a new certificate acts as a barrier to prompt competitive adjustment, while the creation of a larger class of potential entrants will press incumbent operators to offer responsive service. Third, the narrower the authority the greater the occasion for unnecessary regulation and its ensuing economic loss.[85]

These objectives may be laudable. They would be served even better by the complete removal of all licensing requirements. Congress did not, however, see fit to deregulate motor carriage. Indeed, it explicitly forbade the Commission to go beyond the powers vested in it by statute and provided it in such detail both for the removal of restrictions on existing certificates and for the alteration of the public convenience showing necessary for the approval of new certificates that it would be anomalous to leave to inference a matter of such significance as the general broadening of new authority.

The Commission relies also on deduction. The Commission reasons that, if restrictions on existing carriers are to be eased, "broad, unencumbered authority" must be granted future applicants, whether or not they seek such authority.[86] It is a nonsequitur to conclude that, because a carrier may, if it voluntarily seeks to broaden authority it already possesses, obtain a reasonably broad extension, such broad, unencumbered authority must be thrust upon all applicants for new certificates whether or not they seek it. The argument implies that a loophole would be created if an applicant were permitted or required to obtain a limited new certificate and could then immediately seek its extension. An applicant would be able to obtain such a result, however, only if it were not required to demonstrate its fitness, willingness and ability to perform

the extended service, as it must for a new certificate.

The Commission also argues that this step will help to eliminate the industry's manipulative and anticompetitive practice of constraining applicants to seek very narrow authority by threatening opposition to broader applications and imposing the potentially great expense and delay of litigation on them if they refuse to comply. This pressure perhaps accounts for the fact that, sixty to seventy percent of applications are unopposed and over ninety-five percent are granted.[87] The past industry practice of bullying applicants into narrow applications may be counter to Commission policy; as the Commission itself observed in the statement, the practice may have reflected a recognition by applicants that it was prudent to accommodate the interests of competitors rather than to litigate the full scope of the needed authority.

■ The Commission, however, has authority to deal with these practices in a suitable fashion; it may refuse to grant excessively narrow applications or it may deal summarily with the kind of obstructive tactics it condemns. Our recognition that it has this power, however, is not tantamount to ratification of the cathartic it has adopted. The Motor Carrier Act continues to require the Commission to exact in the future, as it has in the past, the showing of at least general fitness, willingness, and ability to perform the services authorized by the certificate. The Commission's action on new applications is not subject to the same statutory time constraints as those on its processing or restriction removal applications. While it should not be dilatory, it is given more time to resolve problems. Our conclusion that the Commission has gone too far does not obliterate the Commission's power to take any measures at all.

85. 45 Fed.Reg. 86,798, 86,798 (1980).

86. *Id.* ("[If we broaden authorities] for carriers with existing authorities, we must also assure that future authorities are not subject to the

same defects the Congress perceived in our past practices.").

87. *Id.*

## 3.2 NEW CERTIFICATES STATE-MENT: POLICY OR RULE

■ The New Certificates Statement purports to be a policy statement.[88] Whether it is merely such a general guide or whether it is a rule masquerading in policy garb, we determine by the criteria discussed in Part 2.2 *supra.* The Commission gave notice of its proposal,[89] received comments from a host of interested persons,[90] and modified its proposal in the light of those comments. It has, therefore, complied with the procedural requirements of the APA for rulemaking. 5 U.S.C. § 553. Our examination of the substance and effect of the statement to determine whether it is a guide for applicants or a quasi-legislative rule, normative in operation, is only for the purpose of determining the scope of judicial review.

While the introductory portion of the Statement is phrased in advisory terms, the text itself is mandatory. The Statement *"direct[s]* future applicants to follow certain guidelines in casting their requests for authority."[91] "As a general rule, *no* restrictions would be allowed except in *highly* unusual instances." The Commission "expect[s] applicants to employ commodity descriptions which are *at least* as broad as the standard industry groupings [it] earlier proposed." Its "Employee Boards will screen applications to *ensure* that broad commodity descriptions are being used." "Carriers *are to be able* to perform as complete a service as possible."[92] "Authorizations of less than the total public need *can no longer be tolerated.*"[93] "[W]e *must* in the future grant authority free of gateway restrictions

and narrow territorial limitations."[94] "Where applicants justify a need for service in the entire United States, it *will* include service to points in Alaska and Hawaii."[95] "Service over regular routes . . . *is* to be two way."[96] "[W]e intend generally to *disallow all restrictions* except those implicitly or expressly acceptable in the Act."[97] (All emphasis in this paragraph is supplied.)

Besides looking at the actual words of the policy statement, we may also look at the Commission's actual practices under these "guidelines." If, indeed, the only tests of the policy were hypotheticals, remote in probability and unlikely from past experience, there might be cogency to the Commission's suggestion that we confine our review to the words of the promulgations. But even then we would be required to test the policy by its application, for the rationality of an administrative declaration is not determined by prosody but by determining whether the application of the principle to those regulated by the agency is consistent with its statutory mandate.[98] We may consider the actual application of the policy statement, not only in interpreting it and in determining its rationality, but also in deciding whether what professes to be mere guideline, yielding to evidence in any specific case, is instead a rule to which all must conform.

■ In short, in its announcement in the New Certificates Statement, the Commission has prescribed the use of its list of certain commodity descriptions, "discouraged" the use of any deviations from the list, and required justification for proposing a deviation from the prescribed list.[99] The

---

88. 45 Fed.Reg. 86,709 (1980).

89. 45 Fed.Reg. 45,545 (1980).

90. 45 Fed.Reg. 86,789, 86,807 (1980) (Appendix B—Comments of Interested Persons).

91. *Id.* at 86,799.

92. *Id.*

93. *Id.* at 86,800.

94. *Id.* at 86,802.

95. *Id.* at 86,803.

96. *Id.*

97. *Id.* at 86,803–04.

98. *See* note 23 *supra.*

99. In numerous instances the Commission has granted applicants authority they did not seek. In the following cases the applicants applied for authority *to transport general commodities* (*except* household goods and classes A and B explosives) but were granted by the Commission authority to haul *all* general commodities except classes A and B explosives:

Commission states that carriers may seek to justify departure from its standards.[100] This imposes the same in terrorem constraint that the Commission found to have been the past practice but now condemns: the fear of lengthy and expensive litigation.

Granting that the distinction between policy declaration and legislative rule is blurred, we conclude that the New Certificates Statement is more appropriately to be considered a rule and that the validity of its prescriptions must be evaluated on this basis.[101]

### 3.3 COMMODITIES

From the inception of regulation of the motor carrier industry, commodity descriptions have presented the Commission with problems of interpretation and enforcement. Attempts have been made to develop a consistent methodology for describing commodities, and three principal formulas have been used: (1) specific naming of a commodity, (2) reference to intended future use, and (3) generic or class-term commodity descriptions.[102]

A primary concern of the Commission in framing grants of authority has always been to enable a carrier to render shippers and the public a complete transportation service. Broad grants of authority also take cognizance of technological modifications, changing industrial patterns and future needs. Moreover, broad commodity authorizations allow carriers to meet changing needs of shippers, receivers, and consumers, market demands, and the diverse requirements of the shipping public. 49 U.S.C.A. § 10101(a)(7)(A) & (B).

■ Congress has mandated that the Commission "reasonably broaden the categories of commodities authorized by the carrier's certificate or permit." *Id.* § 10922(h)(1)(B)(i). In defining the type of commodity descriptions acceptable from new applicants, the Commission may, as in the case of restriction removal, discussed in Part 2.3 above, start with STCC, or other classifications of similar breadth. The Commission may not, however, require all applicants regardless of circumstances to fit Procrustean descriptions, and it may not assume that an applicant fit, willing, and able to carry one commodity in an STCC classification, is fit, willing, and able to carry all commodities in that classification.

### 3.3.1 Bulk Service

The New Certificates Statement states that the Commission's policy is to "disallow all restrictions except those implicitly or

---

Wayne Thomas, MC 153474 (Sub–1), 46 Fed. Reg. 11,725 (1981); American Freight System, Inc., MC 144678 (Sub–34), *id.* at 11,073 (1981); Emmett Bond, MC 153562, *id.* at 11,063 (1981); Babson Bros. Trucking Co., MC 153524, *id.* at 11,056 (1981); WPX Freight System, Inc., MC 139960, *id.* at 10,873 (1981); R.F. Westbury, MC 145011 (Sub–12F), *id.* at 9,803 (1981). Numerous other instances are cited in the petitioners' briefs and no suggestion that these are erroneous or atypical has been made by the Commission.

The New Certificate Statement has been applied in mechanistic fashion to other applicants. Thus, in *Red Arrow Freight Lines, Inc. v. ICC, appeal docketed*, No. 81–4109, (5th Cir. Apr. 2, 1981), the applicant testified, in response to an opposing carrier's argument that it "is not in a position to handle and does not intend to handle [bulk commodities] now or in the foreseeable future," that it had no tank vehicles or no intention to purchase any, and that the only reason it applied for general commodities unrestricted to bulk was because it believed it had to use that description under the Commission's "policy statement." Neverthe-

less, the Commission refused to restrict the grant of authority against transportation of bulk commodities.

In *Steere Tank Lines, Inc. v. ICC appeal docketed*, No. 81–4170, (5th Cir. May 11, 1981), the petitioner opposed the application because it included bulk commodities pursuant to the "policy statement," pointing out applicant had never provided bulk service, had no shippers seeking that service now, and had no equipment or intention to render such service. The applicant conceded all these matters and took no position on whether a restriction should be placed on the certificate. The Commission stated that it "no longer favors imposing bulk restrictions" as they are "too restrictive."

**100.** 45 Fed.Reg. 86,798, 86,802 (1980) ("All other [categories] are discouraged, and deviations will require some justification.").

**101.** *See* note 50 *supra.*

**102.** *See* C & H Transp. Co., Interpretation of Certificate, 62 M.C.C. 586, 587 (1954).

explicitly acceptable in the Act," [103] including elimination of bulk services restrictions from grants of general commodities authority. The Commission recognized that "[w]hile it is true that every carrier does not operate every type of equipment all of the time," it still maintained that "nothing is gained by limiting authorities merely because the applicant does not already have the special equipment." [104] Apparently, the Commission was motivated by a desire to achieve "overall transportation economies and efficiencies . . . by encouraging competition." [105]

Here, as also discussed in Part 2.3.1 *supra*, the Commission has exceeded its statutory mandate by granting authority to carriers who cannot demonstrate that they are "fit, willing, and able to provide the transportation to be authorized by the certificate." [106] Bulk service requires special equipment, such as tank trucks, that many carriers do not have. Moreover, as pointed out by opponents to the Commission's statement, most carriers are not fit to provide bulk service because they will not have the proper cleaning facilities for tank trucks, and in the case of hazardous bulk materials (other than class A and B explosives), will not know the appropriate safety regulations for handling bulk items, or have satisfied the special insurance limits pertaining to hazardous materials. [107]

### 3.3.2 Household Goods

For the reasons already given in Part 2.3.2 *supra*, the granting of authority to transport household goods must be excepted from general commodities authority unless the applicant demonstrates fitness,

willingness and ability to render that service.

### 3.4 TERRITORY

The Motor Carrier Act demonstrates special concern with territorial restrictions in existing certificates. In addition to the elimination of unreasonable or excessively narrow territorial limitations, the Commission is to authorize transportation service to intermediate points on the carrier's route and round trip authority instead of only one-way authority. [108] In connection with the issuance of *new* certificates, however, it omits any express mention of territorial limitations just as it omits any mention of commodity authority. [109] The Commission's power to require broader applications or to issue certificates with wider territorial authority than the carrier originally sought must depend on its inherent power or on inferences derived from the purposes of the Motor Carrier Act and its provisions requiring the broadening of existing certificates. [110]

Relying on the same considerations on which it based its commodity guidelines, the Commission implements its new policy by "directing future applicants" to describe requested "routes or territories in broad terms. As a general rule, no restrictions would be allowed except in highly unusual situations." The Commission described its modifications as "modest expansions of the geographic descriptions in most cases," and this appears to be accurate.

Common carrier, irregular-route authority is modified to include two-way-authorizations, service areas no smaller in size than county-wide, and authority to serve points in Alaska and Hawaii as part of the

**103.** 45 Fed.Reg. 86,798, 86,803–04 (1980).

**104.** *Id.* at 86,804.

**105.** *Id.*

**106.** 49 U.S.C.A. § 10922(b)(1)(A), *see, e. g., Steere Tank Lines, Inc. v. ICC, appeal* docketed, No. 81–4170 (5th Cir. May 11, 1981); *Red Arrow Freight Lines, Inc. v. ICC, appeal* docketed, No. 81–4109 (5th Cir. April 2, 1981).

**107.** 45 Fed.Reg. 86,798, 86,804 (1980).

**108.** 49 U.S.C.A. § 10922(h)(1)(B).

**109.** *Id.* § 10922(b)(1).

**110.** 45 Fed.Reg. 86,798, 86,798 (1980). ("Logic dictates that, if we take these actions for carriers with existing authorities, we must also assure that future authorities are not subject to the same defects the Congress perceived in our past practices.").

authorization to serve points in the United States.[111]

■ There is no challenge to the two-way service policy. For reasons we have already discussed in connection with broadening existing certificates, the Commission's decision not to limit authority to one point but to embrace a geographic area no smaller than a county is reasonable. As the Commission observed:

Countywide minima are but a minor incursion but do begin to attack the problem of carriers having an insufficient service base. Carriers often cannot serve other consignors or consignees in the general area of existing customers because their authority is limited to plantsites or very narrowly defined places. Discouraging minute limitations on the area an irregular-route carrier can serve should cure this problem.

45 Fed.Reg. 86,798, 86,802 (1980).

■ However, the Commission also decided to include Alaska and Hawaii automatically in all certifications if applicants justify a need for service in the forty-eight contiguous states. The Commission states that this is "to encourage service to these points, especially by intermodal arrangements." *Id.* at 86,803. The statutory requisites of fitness, willingness, and ability must still be satisfied, however. 49 U.S.C.A. § 10922(b)(1). While a showing of representative need may be consistent with the public convenience and necessity criteria, the notion that any carrier fit, willing, and able to transport throughout the continental forty-eight states is ipso facto fit, willing and able, by intermodal service or otherwise, to provide service to Alaska, 2,385 miles by land from the northwesternmost point of Washington State to Anchorage, and to Hawaii, 2,392 miles by sea or air from San Francisco, defies logic. The Commission's decision obviously rests solely on the stimulation of competition, a goal that cannot be exalted above all others, for, as we have already pointed out, were it the sole objective, there would be no certifi-

cates. Accordingly, we hold this automatic authority provision to be invalid. The Commission may, upon remand, however, consider authorizing those forty-eight state carriers who are found to be fit, willing, and able to provide services to Alaska and Hawaii, to render that service upon a representative showing of need. *Miller Transporters, Inc. v. United States,* 594 F.2d 463 (5th Cir. 1979).

### 3.5 PUBLIC NEED

Those opposing the New Certificates Statement noted that "[c]arriers seeking authority must show that their proposals would serve a useful public purpose, responsive to a public demand or need." 45 Fed. Reg. 86,798, 86,799 (1980). Therefore, in the carriers' view, the Commission "must examine each application minutely and grant only to the actual extent of support given." *Id.*

■ The Commission properly responded that "this view contains hypotheses that too narrowly interpret the evidentiary bases on which [the Commission] may grant authorities." *Id.* The statute does not limit it merely to considering and granting authorities based on shipper support or presently moving traffic. Just as in the past, it may consider other evidence, such as traffic studies or anticipated future movements. *Id.* at 86,799–86,800. The Commission must consider all evidence in light of a number of factors, most notably those in the national transportation policy. 49 U.S.C. § 10101(a)(7). Therefore, in considering each application, it must weigh, when applicable, "a need or demand for new services, innovative quality or price options, increased competition, greater fuel efficiency, improved service for small communities, improved opportunities for minorities, and any other benefits that would serve a useful purpose." H.R.Rep.No.1069, *supra* note 13, at 15, *reprinted in* [1980] U.S.Code Cong. & Ad.News, at 2297. Shipper support is only part of a schematic representation that can evince a public purpose sufficient to justify a grant of new authority. Other evidence

---

111. *Id.* at 86,802.

must be considered, and grants broader than existing shipper needs may be made.

█ It is well established that the Commission can grant authority based on representative evidence. Thus, a grant of state-wide authority has never needed support from all, or even most, municipalities in the State.[112] All that has been required is support from a representative number of municipalities in the state. Similarly, broad commodity descriptions have been granted based on evidence of a representative showing of commodities falling within that broad description.

### 3.6 MASTER LICENSING

Paragraph (3) of new section 10922(b) provides that the Commission may not issue a certificate on the basis of general findings regarding public convenience and necessity developed in rulemaking proceedings. The provision was designed to preclude the use of the so-called master certificate approach to granting certificates.[113] Under the "master certificate" approach, "the Commission makes one general finding of public need for a specific type of transportation without looking at the individual carriers and situations involved." S.Rep.No.641, *supra* note 14, at 6.

█ The argument that the Commission is engaging in master licensing is without merit. The sub-section prohibiting master licensing, 49 U.S.C. § 10922(b)(3), states that the Commission may not make findings of public need based upon general findings developed in rulemaking proceedings. Since it proposes to make findings of a need for service by each applicant in accord with the procedures and standards affirmatively stated in the Motor Carrier Act of 1980, no master licensing is involved. 45 Fed.Reg. 86,798, 86,800 (1980).

### SUMMARY

We conclude that the portion of the Restriction Removal Statement, Ex Parte No.

MC–142 (Sub. No. 1), denoted "Guidelines" in reality promulgates rules that are subject to judicial review. Several of these rules are improper because they exceed the statutory direction to *reasonably* broaden existing certificates. Therefore, we find invalid as beyond the Commission's authority the rules that virtually require all applicants who seek broader authority to transport commodities to fit into fixed molds of commodity descriptions and the rules authorizing every carrier who requests general commodities authority to carry bulk commodities and household goods. Carriers affected by each of these rules may not be fit, willing, and able to provide the service authorized by the broadened certificate. In all other regards, we reject the attacks on the Commission's regulations regarding restriction removal.

The New Certificates Statement, Ex Parte No. 55 (Sub. No. 43A), although denominated a "policy statement" by the Commission, also in reality contains binding rules. The Commission's rules broadening acceptable commodity classifications and the rules authorizing those requesting general commodities authorities also to carry bulk commodities and household goods are unreasonably broad unless the carrier is required to demonstrate that it is fit, willing, and able to provide the service to be authorized by the certificate. We also find that, in the absence of a showing of fitness, willingness, and ability, authority to serve points in Alaska and Hawaii as part of authority to serve points in the continental United States is an unreasonable territorial expansion.

Accordingly, we remand for further proceedings consistent with this opinion. Costs are to be equally divided.

REMANDED.

---

**112.** *See, e. g., Miller Transporters, Inc. v. United States,* 594 F.2d 463 (5th Cir. 1979).

**113.** H.R.Rep.No.1069, *supra* note 13, at 15, *reprinted in* [1980] U.S.Code Cong. & Ad.News, at 2297; S.Rep.No.641, *supra* note 14, at 6.