**MILLER TRANSPORTERS, INC., and Chem-Haulers, Inc., Petitioners,**

v.

**The UNITED STATES of America and Interstate Commerce Commission, Respondents.**

**No. 77-2889.**

United States Court of Appeals, Fifth Circuit.

May 4, 1979.

**464**

Harold D. Miller, Jr., Phineas Stevens, Jackson, Miss., for petitioners.

James S. Wilson, Jr., Paris, Ky., for Motor Fuel Carriers, Inc.

Christine Kohl, ICC, Edward E. Lawson, Dept. of Justice, Frederick W. Read, III, ICC, Griffin B. Bell, Atty. Gen., John H. Shenefield, Asst. Atty. Gen., U. S. Dept. of Justice, Mark Evans, ICC, Gen. Counsel, James P. Tuite, Atty., Washington, D. C., for respondents.

W. Guy McKenzie, Jr., Thomas F. Panebianco, Tallahassee, Fla., Sol H. Proctor, Jacksonville, Fla., for McKenzie Tank Lines, Inc.

Before COLEMAN, CLARK and RUBIN, Circuit Judges.

CHARLES CLARK, Circuit Judge:

This is an appeal from an Interstate Commerce Commission (I.C.C.) order granting broad new operating authority to McKenzie Tank Lines, Inc. (McKenzie), a motor common carrier. We find the I.C.C.'s action supported by substantial evidence and not arbitrary or capricious, and affirm the order.

McKenzie is a motor common carrier specializing in the transportation in bulk of petroleum products. McKenzie sought to augment its existing operating authority by applying for a certificate of public convenience and necessity authorizing it to transport all petroleum products between all points in the three-state area of Alabama, Georgia and Florida. The Commission granted McKenzie substantially what it sought, authorizing McKenzie to transport all "petroleum and petroleum products" between all points in the three states, except for a restriction against the transportation of traffic originating at points in Bay and Duval Counties, Florida.

The three petitioners are competing trucking firms that object to McKenzie's new operating authority. Two of the petitioners, Miller Transporters, Inc. (Miller) and Chem-Haulers, Inc. (Chem-Haulers) challenge only that aspect of the. I.C.C. order which allows McKenzie to ship all petroleum products from any originating point in Alabama. They would confine McKenzie's Alabama originating traffic to the shipment of fuel oils, mineral spirits and solvents only rather than "all petroleum products," and would further restrict the Alabama originating points to Mobile, Alabama, alone. The third petitioner, Motor Fuel Carriers, Inc. (Motor Fuel) launches a broader challenge to the order, objecting to the all-points service within Georgia and Florida to the extent that Motor Fuel already provides that service.

No procedural questions are raised on appeal; the sole issue is whether the I.C.C. order was arbitrary and capricious or unsupported by substantial evidence.

### I.

█ The traditional practice of the I.C.C. in the area of petroleum transportation is to grant "radial" operating authority from a designated origination point to all points within a specified radius of that origin. The practice reflects the fact that petroleum origination points are relatively few in number, existing only at ports or other supply depots, while destination points are legion—existing at every place where petroleum products are consumed. The origin or supply point authorizations are valuable to petroleum haulers, and Motor Fuel, Chem-Haulers and Miller all seek to defend their existing supply point authorizations against incursions by McKenzie.

A total of 19 public witnesses testified before the Commission's joint board to express a need for additional motor carrier service in their areas. The needs of the various shippers varied considerably both in terms of the types of petroleum products they wished to transport and the origin and destination points which they needed served. The witnesses did not express present or future needs for additional service from all supply points in Alabama, Georgia and Florida. The Commission takes the position, however, that a sufficiently "representative" number of points were discussed by the witnesses to justify "all points" authority for McKenzie. Motor Fuel claims that the witnesses did not establish any need for all points authority duplicative of Motor Fuel's existing service in Florida and Georgia. Chem-Haulers and Miller claim that the witnesses did not establish a need for any new origination point service in Alabama except in Mobile. In discussing the sufficiency of the evidence, we deal first with the Alabama-based challenge of Miller and Chem-Haulers, and secondly with the Florida, Georgia-based challenge of Motor Fuel.

### A.

Witnesses testified as to present and future needs for service originating at Centre, Tuscaloosa, Theodore, Mobile, Birmingport, Bay, Minette, Chickasaw, Anniston, Montgomery, and Birmingham, Alabama. Ten different shippers testified as to various needs from these Alabama origination points. The expressed need of several of these shippers was substantial, and reflected dissatisfaction with the adequacy of service provided by Miller or Chem-Haulers. The Commission summarized the needs of one such shipper, Hudson Oil Company, by stating:

Hudson Oil Company has over 400 stations in 38 states. In Florida, Georgia and Alabama it has between 45 and 50 stations . . . . Its stations in Panama City and Pensacola, Florida are supplied from Mobile, Alabama and have a monthly volume of 80,000 to 100,000 gallons each. Hudson uses Miller Transporters to provide transportation from Mobile, Alabama to Pensacola and Panama City, Florida. It knows of no other carrier authorized from Mobile. Hudson's stations have been forced to close on an average of twice a month because of inability to get deliveries from Miller. Hudson has contacted Miller in attempts to correct the situation but there has been no improvement. A Hudson station has been closed for maybe a day and a half. A load ordered for Saturday morning may not be delivered until Tuesday afternoon . . . .

Chem-Haulers and Miller concede that the testimony of Hudson Oil, as well as the testimony of two other shippers, Belcher Oil Co. and A–Z Products Co., constitutes substantial evidence as to the need for increased service at Mobile, Chickasaw and Theodore, Alabama. They attempt to denigrate the significance of the testimony, however, of shippers such as Wingate Trucking Co., Pensacola Terminals, Beacon Stores, Weaver Oil Co., Great Southern Paper Co., Walker Oil Co., Whitaker Oil Co., and Save-More Oil Co., because those shippers testified primarily as to anticipated

rather than presently existing needs or dissatisfaction with the past performance of carriers already servicing their areas.

However, unusual it may be for the government to consider the future in the regulation of petroleum-related industries, the decision to do so is hardly irrational. The Interstate Commerce Act by its terms requires the Commission to consider the present and future public convenience and necessity when issuing operating authority. 49 U.S.C. § 307(a). "[T]he Commission must consider future needs and changes in commerce even when they are uncertain." *Trans-American Van Service, Inc. v. United States,* 421 F.Supp. 308, 329 (N.D.Tex.1976). *See also Hilt Truck Line, Inc. v. United States,* 532 F.2d 1199, 1203 (8th Cir. 1976); *Frozen Food Express, Inc. v. United States,* 301 F.Supp. 1322, 1328 (N.D.Tex.1969). The weight and credibility of the shipper testimony was a matter for the Commission; it was free to believe that the contemplated needs of the shippers who testified were genuine and significant. We find that as to all Alabama origin points actually testified to, the Commission's order was supported by substantial evidence.

Chem-Haulers and Miller assert that even if the Alabama origin points actually testified to were supported by substantial evidence, the testimony as to those points cannot support McKenzie's new authority to service all points in Alabama. As to the majority of those points, they state, there is no supporting evidence in the record.[1]

This argument of Miller and Chem-Haulers is unpersuasive. The number of geographic supply points for petroleum products within Alabama is relatively limited. Chem-Haulers, for example, services only 16 such points, and McKenzie 22. The Commission was entitled to conclude that the ten shippers who testified concerning various present and future needs from Mobile, Birmingham, Centre, Tucaloosa, Theodore, Birmingport, Montgomery, Anniston, Bay,

Minette and Chickasaw were sufficiently representative of needs throughout Alabama to justify all points authority.

The practice of permitting area wide authority on the basis of only a representative showing of the need for new service throughout the area is amply supported by precedent. In *Atlanta-New Orleans Motor Freight Co. v. United States,* 197 F.Supp. 364 (N.D.Ga.1961) (three-judge court), a carrier sought to service an area encompassing 150 different geographic points, but offered evidence only as to 22 of those points. The court found that evidence sufficient, stating that:

> The fact that there was little or no direct testimony with respect to the need for improved service between Atlanta and certain named points in the involved area does not require the deletion of these points from the grant of authority. It is vital to remember that M.R. & R. was not merely seeking permission to serve these or other individual points—its request was to extend operations from Atlanta to all of the approximately 150 points within the disputed area. Considering the broad scope of this application, it could not reasonably be expected that the applicant would demonstrate need for improved service with specific reference to each and every one of the involved points.

197 F.Supp. at 368. A representative showing of need gives rise to an inference that all points in a given area will benefit from new service. In endorsing the representative showing approach, the court in *Hudson Transit Lines, Inc. v. United States,* 314 F.Supp. 197 (D.N.J.1970) (three-judge court), found it sufficient that "the Commission considered the areas of operation as a whole and deduced that the conditions prevailing in the representative parts existed generally throughout the entire area served." 314 F.Supp. at 202. "A showing of need at numerous representative points raises a rebuttable presumption of a re-

---

1. Miller complains that there is no evidence as to the towns of Cordova, Fox, McIntosh, Le Moyne, River Falls, Albertville, Chatham, Escambia County, Decatur, Madison, Fort Birmingham, Eufaula, Moundville, Citronelle, Evans City, Arab, Altoona, Fayette, Estaboga, Opp, Huntsville, and Lynn Park, Alabama.

quirement for extended service at those points for which testimony is not available." *American Trucking Associations, Inc. v. United States*, 373 F.Supp. 252, 256 (W.D. Tex.1973) (three-judge court). The representative sampling concept has been held sufficient to justify authority over the two-state area of Minnesota and Wisconsin, *Midwest Coast Transport, Inc. v. Interstate Commerce Commission*, 536 F.2d 256, 260 (8th Cir. 1976), and has even been applied to justify a nationwide grant of authority. *National Trailer Convoy, Inc. v. United States*, 381 F.Supp. 878, 882 (N.D.Okl.1973) (three-judge court).

The Commission in the instant case found a special reason to favor a broad grant of authority. In its summary conclusions, the Joint Board stated:

> The evidence establishes a need for a non-radial petroleum transportation authority over most of the territory the applicant has applied for. New transportation needs have developed from America's energy shortage which cannot be met by the existing carriers whose operating authorities are tied to a limited number of origin points. The testimony has shown that numerous new storage and shipping locations have come into existence since the oil shortage began. Fuel oils, which are delivered by transport truck, have supplanted natural gas for industrial boiler fuel. Petroleum products are being hauled much greater distances from more numerous origins, and, in the case of fuel oils, in far greater volumes.

> Distributors and industries now must frequently switch their purchasing between numerous supply points. The Federal Energy Administration allocates product by monthly quotas. When a purchaser's supply quota is exhausted he must try other sources. The locations where surplus product is available vary from month to month or season to season. A common refrain from most witnesses was the need for the carrier to be able to switch among a number of supply points

on short notice depending upon where product was available.

> Obviously the necessary equipment and drivers cannot be standing by at all supply locations. The more efficient approach to meeting these new transportation needs, brought on by the energy shortage, is to authorize a service where the carrier can switch its equipment between the several supply locations. This is the type service requested by the witnesses presented. The petroleum shortage, and resultant changed distribution pattern, make such a service necessary to meet present and future needs throughout most of the area involved in this application.

Mindful of the limited scope of our review of the I.C.C.'s order, we cannot say that the I.C.C.'s determination that the evidence presented by McKenzie was sufficiently representative to justify all points authority was arbitrary and capricious or not based on substantial evidence. Choosing to meet the need for increased flexibility in the carriage of oil products is certainly rational in light of the nation's uncertain energy situation. Once accepted as rational, selecting among reasonable alternatives to satisfy the need is the province of the Commission, not the courts. *See United States v. Central Truck Lines*, 548 F.2d 523 (5th Cir. 1977); *Refrigerated Transport Co., Inc. v. Interstate Commerce Commission*, 552 F.2d 1162, 1164–65 (5th Cir. 1977). We decline to play a numbers game designed to devise a precise formula as to whether evidence of the need for service at 10 points is enough to justify service at 20 or 30 more. It would have been an unreasonable burden to require McKenzie to adduce proof concerning even a majority of the many small towns in Alabama already served by Miller and Chem-Haulers. McKenzie produced public witnesses who complained of the existing service of Miller and Chem-Haulers and who contemplated additional future requirements. The decision by the Commission based on that substantial evidence to grant all points authority within Alabama was not arbitrary or capricious.

Finally, Chem-Haulers and Miller protest the grant of authority to McKenzie to transport "all petroleum products," a designation encompassing 144 separate petroleum-related commodities. They claim that McKenzie's authority should have been limited to fuel oils, mineral spirits and solvents. The "all petroleum products" authorization is a common, if not preferred, commodity designation of the I.C.C. As early as 1948, the Commission stated:

> [We] have consistently found that a motor carrier, engaged in the transportation of petroleum products, in bulk, in tank vehicles, should not, except in certain circumstances, be restricted to the transportation of only certain petroleum products.

Ford Bros. Extension of Operations—Virginia, 47 M.C.C. 731 (1948). See, e. g., Descriptions in Motor Carriers Certificates, 61 M.C.C. 209 (1952); Younger Brothers v. United States, 238 F.Supp. 859, 860–61 (N.D.Tex.1965). The broad commodity designation is nothing new to the parties in this litigation. McKenzie has been granted the "all petroleum products" authorization three times in the past, Chem-Haulers has been granted such authority seven times, and Miller six times. The record includes testimony involving petroleum products as many and varied as premium and no-lead gasoline, diesel fuel, various grades of heating oil, high octane gasoline components, butanes, mineral spirits, casinghead gasoline, solvents, benzine, styrene monomer, normal butanol, isopropyl alcohol, xylene and kerosene. Based on past Commission policy and the evidence developed by McKenzie, there was nothing improper in the Commission's "all petroleum products" designation.

### B.

The Commission stated that "[n]o protestant save Motor Fuel produced any evidence of substantial adverse effect" from the new McKenzie authority. The Commission found that significant damage to Motor Fuel's business would be prevented by excepting Bay and Duval Counties, Florida, from McKenzie's originating point authority:

> Any potential diversion of traffic to the applicant would be likely offset by the increased over-all demand. Duval County, Florida, as a point of origin, was eliminated by amendment. Elimination of Bay County, Florida, as a point of origin, will prevent any serious dilution of Motor Fuel Carriers' revenues.

and further found:

> Any temporary diminution of protestants' revenues from authorization of a new competitor should be quickly overcome due to the increased hauling demand. In any event the needs of the shipping public, presently not fully met, must be accorded the greater weight.

The compromise effected by the restriction against traffic from Bay and Duval Counties was a rational accommodation of the competing interests of Motor Fuel and McKenzie, and the accommodation was based on substantial evidence of increased public need. Testimony in the record reflected present and future needs for service from points such as Atlanta, Columbus, Albany, Savannah, Doraville, Bainbridge, Baxley and Blakely in Georgia, and from St. Marks, Sanford, Southport, Tampa, Port Manatee, Yankeetown, Taft, Panama City, Pensacola, Niceville, Canaveral, West Palm Beach, Miami, Fort Myers, Boc Grande, Sarasota, Port St. Joe, Jacksonville, Crestview, Tallahassee and Eaton Park in Florida.

Shippers from different locations and with various needs testified as to the inadequacy of existing service. Pogge Oil complained of service from Albany, Georgia, to Florida. The Triangle Company complained of service out of Niceville, Florida. Charter Chemicals and Whitaker Oil spoke of poor service out of Columbus, Georgia. Weaver Oil testified as to existing needs from Pensacola, Florida, and Bainbridge, Georgia, and spoke of expected future supply needs from Mobile, Alabama, Panama City and St. Marks, Florida, and Bailey, Georgia. Great Southern Paper Company similarly described present needs from St. Marks, Port St. Joe, Pensacola, Panama

City and Mobile. Other testimony reflected present construction that will result in future needs. The Tensaw Refining Company was upgrading a refinery at St. Marks. The Save-More Oil Company was constructing a terminal and gasoline blending facility at Sanford.

As was the case in our consideration of Alabama origin points, we cannot say that the Commission's decision to credit evidence of the future needs of these locations or its decision that these locations were sufficiently representative to justify all points authority was improper. Although many supply points within the two states were not covered by testimony, and although some of the testimony as to needs of locations that were covered was speculative, it was not at all irrational for the Commission to conclude that based on the substantial evidence of public need before it, all-points authority held out the best promise of a flexible, long range solution to the problem of satisfying the public's need for transportation of oil products.

■ Motor Fuel will be subject to new competition from McKenzie at some of the points encompassed by McKenzie's new authority.[2] Indeed, competition was specifically considered by the Commission and regarded as a positive attribute of McKenzie's application:

> Institution of the proposed McKenzie service would institute healthy competition at those points now served by only a single carrier. Some of the shippers' difficulties can be attributed to failure of an authorized carrier to station equipment at an authorized origin. In other instances, although two carriers are authorized, only one is electing to provide service. Authorization of McKenzie, which has 16 terminals throughout the involved territory, should fill the present unmet petroleum transportation needs.

The Commission has stated in the past that motor carriers enjoy no vested immunity from competition:

[E]xisting carriers have no absolute immunity against future competition. Even where the competition resulting from a newly authorized service will cause a carrier already providing service to lose revenue, the issuance of new authority may best serve the public convenience and necessity.

Kaylor and Stuart Extension-Copperhill, Tenn., 124 M.C.C. 441, 446 (1976). "A grant of operating authority which allows the entrance of a new competitor into markets serviced by existing carriers will necessarily produce an adverse effect on those carriers." *Hilt Truck Line, Inc. v. United States, supra*, 532 F.2d at 1199. "Existing carriers are without a basis for complaint, however, when the provision of new service is in the public interest." *Id.* Existing carriers are protected against destructive competition, but not against competition itself. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 297–98, 95 S.Ct. 438, 448, 42 L.Ed.2d 447, 462 (1974). A new certificate may be in the public interest even when existing carriers will lose revenues. *Norfolk Southern Bus Corp. v. United States*, 96 F.Supp. 756, 761 (E.D.Va.), *aff'd mem.*, 340 U.S. 802, 71 S.Ct. 68, 95 L.Ed. 590 (1950).

The restriction in the order against traffic originating in Bay and Duval Counties is designed to prevent any serious damage to Motor Fuel's economic health. Bay County is Motor Fuel's home base of operations. The Commission found that the substantial Motor Fuel traffic emanating from that County was entitled to protection, and that the restriction "will prevent any serious dilution of Motor Fuel Carrier's revenues." In seeking to expand the Bay and Duval Counties exemption to Port St. Joe, Pensacola, Panama City, Niceville, Freeport, Albany and Bainbridge, Motor Fuel in effect asked for absolute insulation from competition. It was reasonable instead for the Commission to protect only Motor Fuel's most significant traffic.

---

**2.** Motor Fuel concentrates its objections to competition at Port St. Joe, Pensacola, Panama City, Niceville, and Freeport, Florida, and Albany and Bainbridge, Georgia.

## II.

In an area as complex as the motor transportation of petroleum products, litigants should not expect courts to fine-tune regulatory solutions supplied by the I.C.C. Our function is to determine if the agency considered all relevant factors and avoided clear errors in judgment. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Substantial evidence did exist in this case that shippers in Florida, Georgia and Alabama needed additional motor carrier service to accommodate their petroleum-related needs. The Commission properly considered the public need for additional service, the peculiar problems of today's petroleum market, and the effect on existing carriers. Its decision to grant McKenzie broad ranging authority in light of those factors did not reflect a clear error in judgment.

AFFIRMED.