**REFRIGERATED TRANSPORT CO., INC. and Osborn Transportation, Inc., Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and The United States of America, Respondents.**

No. 81–7397.

United States Court of Appeals, Eleventh Circuit.

Sept. 20, 1982.

Serby & Mitchell, P. C., Alan E. Serby, Atlanta, Ga., for petitioners.

Grove, Jaskiewicz, Gilliam & Cobert, Leonard A. Jaskiewicz, Edward J. Kiley, Washington, D. C., for amicus curiae.

Dennis Starks, Atty., I. C. C., Robert B. Nicholson, Mark Del Bianco, Dept. of Justice, Washington, D. C., for respondents.

Ronald K. Kolins, Ross, Hardies, O'Keefe, Babcock & Parsons, Chicago, Ill., for intervenor Claxton Transport, Inc.

Before TJOFLAT and HENDERSON, Circuit Judges, and LYNNE*, District Judge.

LYNNE, District Judge:

Osborn Transportation, Inc. (Osborn), and Refrigerated Transport Company, Inc. (Refrigerated), petition for review of decisions of the Interstate Commerce Commission (ICC or Commission) entered in Docket No. MC–146251 (Sub-No. 5)F, *Claxton Transport, Inc., Extension—Grocery Store Commodities*, and served on the respective dates of March 13, 1981; June 23, 1981; October 19, 1981; and November 6, 1981.[1] We reverse the decision of the Commission's Division 1, acting as an Appellate Division, served March 13, 1981, in which the Division granted the application of Claxton Transport, Inc. (Claxton), for a certificate of operating authority, and remand this proceeding to the Commission with direction either to vacate or to modify the certificate issued to Claxton on April 22, 1981.

## FACTUAL AND PROCEDURAL BACKGROUND

Unique issues have emerged from the convoluted administrative proceedings before the Commission. Claxton, in an application filed with the ICC on August 12, 1980, sought a certificate granting it authority as a motor common carrier to transport over irregular routes such commodities as are dealt in or used by wholesale and retail grocery stores between points in 33 states and the District of Columbia, on the one hand, and, on the other, points in Georgia. Claxton's application was prepared in accordance with the interim rules promulgated by the ICC to implement the provisions of the Motor Carrier Act of 1980,[2] which became effective July 1, 1980. Pursuant to the interim rules, Claxton's appli-

* Honorable Seybourn H. Lynne, U. S. District Judge for the Northern District of Alabama, sitting by designation.

1. Exclusive jurisdiction to review an ICC rule, regulation or final .order is in the Court of Appeals. 28 U.S.C.A. §§ 2321(a), 2342(5) (West 1978 and Supp.1982).

2. Pub.L.No.96–296, 94 Stat. 793 (1980). The interim rules, codified at 49 C.F.R. §§ 1100.-251–.253 (1980), were adopted by the ICC on July 3, 1980. Rules Governing Applications for Operating Authority, 45 Fed.Reg. 45,534 (1980). Final rules, codified at 49 C.F.R. §§ 1100.-251–.253 (1981), were adopted by the ICC on December 31, 1980. Rules Governing Applications for Operating Authority, 45 Fed.Reg. 86,-771 (1980).

cation was submitted on the ICC's application form OP–1. The application was supported by the verified statement of Claxton's president and the verified certification of the support of Piggly-Wiggly Southern, Inc. (Piggly-Wiggly), which showed this supporting shipper's address as Vidalia, Georgia. Where the shipper support form requested representative origin and destination points, Piggly-Wiggly inserted seven cities: "Atlanta, Georgia; Savannah, Georgia; Knoxville, Tennessee; Birmingham, Alabama; Lakeland, Florida; Asheville, North Carolina; Chambersburg, Pennsylvania." The supporting shipper stated that the amount of traffic it would tender the applicant if the application were granted "could be approximately 20 truck loads or more per month."

Claxton's application was published in the Federal Register and two carriers, Osborn and Caudell Transport, Inc. (Caudell), protested the application. The matter was assigned to ICC Review Board No. 1 for an initial decision.

In a decision served January 8, 1981, the Review Board granted Claxton only part of the authority sought. Noting the sketchiness of the supporting shipper's evidence as to the origin and destination of its traffic, and pointing out Claxton's failure to rebut Osborn's statements that all the traffic originated at or was destined to Vidalia,[3] the Board found a public demand or need[4] for the movement of traffic existing only between Knoxville, Birmingham, Lakeland, Asheville, and Chambersburg, on the one hand, and, on the other, Vidalia. Determining that Claxton was fit, willing and able to meet this need and that the protestants had not shown that Claxton's service would impair their operations and injure the public, the Board partially granted the application, limiting the authority to the service for which a public need had been shown.

Claxton administratively appealed the Board's decision. Of the original protestants, only Osborn continued its protest on appeal. Division 1 of the Commission, acting as an Appellate Division, granted the full authority sought in a decision served March 13, 1981.[5] The Division explained its decision as follows:

Ex Parte No. 55 (Sub-No. 43), *Rules Governing Applications for Operating Authority*, 45 F.R. 86771, 86776 (1980),

3. The Board also noted Claxton's failure to rebut Osborn's statement that the traffic to and from Atlanta and Savannah, which were shown as representative points in the application, was intrastate in character and excluded these cities from its limited grant for that reason.

4. The issuance of the certificate in this case is governed by 49 U.S.C.A. § 10922, which provides in part:

(b)(1) Except as provided in this section, the Interstate Commerce Commission shall issue a certificate to a person authorizing that person to provide transportation subject to the jurisdiction of the Commission ... as a motor common carrier of property if the Commission finds—

(A) that the person is fit, willing, and able to provide the transportation to be authorized by the certificate and to comply with this subtitle and the regulations of the Commission; and

(B) on the basis of evidence presented by persons supporting the issuance of the certificate, that *the service proposed will serve a useful public purpose, responsive to a public demand or need*;

unless the Commission finds, on the basis of evidence presented by persons objecting to the issuance of a certificate, that the transportation to be authorized by the certificate is inconsistent with the public convenience and necessity.

(2) In making a finding under paragraph (1) of this subsection, the Commission shall consider and, to the extent applicable, make findings on at least the following:

(A) the transportation policy of section 10101(a) of this title; and

(B) the effect of issuance of the certificate on existing carriers, except that the Commission shall not find diversion of revenue or traffic from an existing carrier to be in and of itself inconsistent with the public convenience and necessity.

. . . . .

(c) A person must file an application with the Commission for a certificate to provide transportation as a motor common carrier or water common carrier. The Commission may approve any part of the application or deny the application.

49 U.S.C.A. § 10922 (West Supp.1982) (emphasis added).

5. Osborn claims that the decision was not served on it. It did become aware of the decision by April 1, 1981.

compels a conclusion different from that reached by the Review Board. Upon publication of the Federal Register notice in this proceeding, a threshold finding that the entire sought service is required was made. Once such a finding is made, protestants must attack the veracity of the evidence submitted by the submission of contradictory evidence. Protestants here have attacked only the weight of applicant's initial presentation, not its veracity, and the threshold findings must stand. The burden now shifts to protestants to show that the application should not be granted.

Protestants have failed to meet their burden here.

By its terms, the Division's decision became effective and administratively final on March 28, 1981. On April 4, 1981, Osborn filed a discretionary appeal to the full Commission, requesting a finding of general transportation importance.[6] Refrigerated simultaneously filed a request for leave to intervene in the discretionary appeal. A certificate of operating authority was issued to Claxton on April 22, 1981, pursuant to the Division's decision. In addition to seeking relief by way of discretionary administrative appeal, Osborn, joined by Refrigerated, petitioned this Court on April 27, 1981, for review of the Division's decision.

In a decision served June 23, 1981, the Commission found the issues raised in Osborn's appeal not of general transportation importance and Refrigerated's request for intervention untimely; accordingly, it denied Osborn's discretionary appeal and Refrigerated's petition to intervene. The Commission, however, reopened the proceeding *on its own motion* and reversed the Division's decision. It found that the evidence in support of the application related solely to movement of groceries between six named cities[7] and was sufficient only to allow a grant between the counties encompassing those cities. The Commission ordered Claxton to show cause within thirty days why the previously issued certificate should not be revoked and a more limited certificate issued.[8]

Claxton responded by contending that the Commission did not have the power to revoke the previously issued certificate and by stating that more time to gather evidence was required. In a decision served October 29, 1981, the Commission asserted it did have such authority and granted thirty additional days for Claxton to show cause. Before the time expired, however, in a decision served November 6, 1981, *on its own motion* the Commission vacated the October 29 decision in its entirety and vacated the June 23 decision to the extent it purported to exercise a power to revoke the outstanding certificate, leaving intact and affirming only the finding that the broad grant of operating authority authorized by the Division was unsupported by the evidence. Relying upon *Civil Aeronautics Board v. Delta Air Lines, Inc.*, 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1961), which involved a statutory scheme similar to that governing the Commission, the Commission concluded it probably did not have the power to change the scope of issued certificates except for inadvertent ministerial error[9] or

6.  Pursuant to 49 U.S.C. § 10322(g)(2)(A) (West Supp.1982), and 49 C.F.R. § 1100.98(c)(2)(ii) (1981), the entire Commission may grant reconsideration of an action of the Commission that was taken by a division if it finds that the action involves a matter of general transportation importance. The regulations refer to this review as a discretionary appeal and require that an application for such review be denominated a "petition for administrative review."

7.  The Commission was referring to the supporting shipper's location and the cities, other than Atlanta and Savannah, named as representative origins and destinations in the supporting shipper's statement.

8.  The Commission also directed that Claxton's request be republished in the Federal Register because the authority found justified was nonradial while the published request was for two-way radial authority. Upon republication, Refrigerated filed a protest and became a full party to the Commission proceedings.

9.  *American Trucking Associations, Inc. v. Frisco Transportation Co.*, 358 U.S. 133, 79 S.Ct. 170, 3 L.Ed.2d 172 (1958) (holding that the Commission had inherent power under its

as provided in 49 U.S.C.A. § 10925.[10] Under *Delta*, the Commission said, "substantive legal error on [or] different policy conclusions do not furnish grounds for the Commission, on its own initiative to vacate or modify an issued certificate."[11] Thus the Commission allowed the certificate issued pursuant to the Division's decision to stand. This Court subsequently granted petitioners' motion for leave to amend the petition for review so as to include the Commission's decisions following the March 13, 1981, action of the Division.

## DISCUSSION

The result of the proceedings before the agency is that Claxton presently holds a certificate of operating authority issued pursuant to the decision of Division 1. Petitioners challenge, in the alternative, the Division's decision authorizing issuance of the certificate and the full Commission's decision declining to vacate or modify that certificate. We agree with petitioners that the grant of such broad authority was unsupported by substantial evidence. Accordingly, we reverse the Division's decision and remand this proceeding to the Commission with direction to vacate or modify the outstanding certificate.[12]

An appellate court, in exercising its statutory jurisdiction to review final orders of

---

broad enabling statute to correct issued certificates containing errors due to clerical inadvertence without invoking the section specifically providing for revocation or amendment).

**10.** Section 10925 provides in relevant part:

(b) ... On complaint or on its own initiative and after notice and an opportunity for a proceeding, the Commission may suspend, amend, or revoke any part of a certificate, permit, or license—

(1) if a motor carrier, broker, or freight forwarder, for willful failure to comply with this subtitle, a regulation or order of the Commission, or a condition of its certificate, permit, or license. . . .

49 U.S.C.A. § 10925(b) (West Supp.1982).

**11.** Though it did so in its decision served October 29, 1981, the Commission, in the decision served November 6, 1981, did not mention or address the effect of 49 U.S.C.A. § 10322(g)(1), which provides:

(g)(1) The Commission may, at any time *on its own initiative* because of *material error*, new evidence, or substantially changed circumstances—

(A) reopen a proceeding;

(B) grant rehearing, reargument, or reconsideration of an action of the Commission; and

(C) *change an action of the Commission*. An interested party may petition to reopen and reconsider an action of the Commission under this paragraph under regulations of the Commission.

49 U.S.C.A. § 10322(g)(1) (West Supp.1982) (emphasis added).

**12.** Petitioners have advanced a number of contentions in addition to their challenge to the substantiality of the evidence. They attack the decision of the Division as "premised upon an unlawful procedural view." Their argument is that the Division's reliance upon a "threshold finding," which, according to the Division, arose upon publication of the Federal Register notice and could only be re-examined if the veracity of the applicant's evidence were questioned, violated provisions of the Administrative Procedure Act (APA), 5 U.S.C. § 500 *et seq.*, and 49 U.S.C.A. § 10322(d) (West Supp. 1982), a provision enacted as part of the Motor Carrier Act of 1980, Pub.L.No.96–296, 94 Stat. 793 (1980). With respect to the APA, they claim, in general terms, violations of 5 U.S.C. §§ 554, 556, and 557. Their only specific contention under the APA is that the Division held it had no right to alter the "threshold finding" in contravention of 5 U.S.C. § 557(b), which provides that on appeal from or review of an initial decision the agency has all the powers it would have in making the initial decision. With respect to the Motor Carrier Act of 1980, petitioners contend that the Division's reliance upon a "threshold finding" arising upon publication of the Federal Register notice and before protestants could submit a response to the application, violated 49 U.S.C.A. § 10322(d), which provides that where the parties have had at least an opportunity to submit evidence in written form they "shall have an opportunity to submit arguments to the initial decisionmaker." Petitioners also suggest that the Division's decision violated due process.

Petitioners alternatively challenge the action of the full Commission in declining to vacate or modify the Claxton certificate. They contend that the Commission erred in determining it lacked authority to direct such a revocation or modification.

In light of our determination that the issuance of the certificate was unsupported by substantial evidence and our disposition of the petition for review, we find it unnecessary to resolve these other contentions advanced by petitioners.

the ICC,[13] must set aside agency action, findings, and conclusions found to be unsupported by substantial evidence. Administrative Procedure Act, 5 U.S.C. § 706(2)(E). Judicial review under the substantial evidence standard is not uncommon in challenges to decisions of the ICC granting a certificate of operating authority. *See, e.g., Refrigerated Transport Co. v. ICC*, 673 F.2d 1196 (11th Cir. 1982); *Refrigerated Transport Co. v. ICC*, 616 F.2d 748 (5th Cir. 1980); *Miller Transporters, Inc. v. United States*, 594 F.2d 463 (5th Cir. 1979). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); *Refrigerated Transport Co.*, 673 F.2d at 1199. To review agency action under this standard, of course, requires an understanding of the law governing actions of the agency. *See id.; Refrigerated Transport Co.*, 616 F.2d at 750–51. In this case we must take into account the changes in the law wrought by the Motor Carrier Act of 1980,[14] which is applicable here since Claxton's application was filed after the effective date of the Act.

The grant of a certificate of operating authority such as that issued to Claxton is governed by 49 U.S.C.A. § 10922(b)(1), which provides, in pertinent part, that the Commission

shall issue a certificate . . . if the Commission finds—

(A) that the person is fit, willing, and able to provide the transportation to be authorized by the certificate . . . and

(B) on the basis of evidence presented by persons supporting the issuance of the certificate, that *the service proposed will serve a useful public purpose, responsive to a public demand or need*;

unless the Commission finds, on the basis of evidence presented by persons objecting to the issuance of the certificate, that the transportation to be authorized by the certificate is inconsistent with the public convenience and necessity.

49 U.S.C.A. § 10922(b)(1) (West Supp.1982) (emphasis added).[15] This section, by its terms, states not only the substantive findings required but also the burden of proof. With respect to Claxton's application, no one disputes the required finding of fitness; only the "public purpose" and "public convenience and necessity" elements of § 10922(b)(1) are challenged.

Section 10922, as quoted above, represents a departure from prior law effected by the Motor Carrier Act of 1980. The House Committee on Public Works and Transportation, in its report accompanying the 1980 legislation, summarized prior law:

Historically, the controlling standard for all motor common carrier applications has been that the proposed service must be 'required by the present or future public convenience and necessity.' Congress entrusted the Commission with defining the statutory standard . . . . Early in the course of motor carrier regulation, the Commission set forth its construction of 'public convenience and necessity' in *Pan-American Bus Lines Operations*; (1 M.C.C. 190, 203 (1936)):

The question, in substance, is whether the new operation or service will serve a useful public purpose, responsive to a public demand or need; whether this purpose can and will be served as well by existing lines or carriers; and whether it can be served by applicant with the new operation or service proposed without endangering or impairing the operation of existing carriers contrary to the public interest.

---

**13.** *See supra* note 1.

**14.** Pub.L.No.96–296, 94 Stat. 793 (1980). The history of the Act has been detailed in *American Trucking Associations, Inc. v. ICC*, 659 F.2d 452 (5th Cir. 1981).

**15.** The relevant portions of § 10922 are set out more fully in note 4, *supra*.

This formulation was the cornerstone of motor common carrier licensing activity for over 40 years.[16]

The Committee, however, rejected the historic approach, which placed the burden upon an applicant to demonstrate that the proposed service was required by the public convenience and necessity, and explained the new § 10922(b)(1) as follows:

[Section 10922(b)(1)] retains the traditional test that all applicants must be fit, willing and able. However, it revises the public convenience and necessity requirement. Specifically, it reduces the burden of proof on persons supporting the application. Persons supporting the application will be required to come forward with some evidence of a public need or demand for the service. Under this standard, proponents of the application must show that the service they propose would serve a useful public purpose, responsive to a public demand or need.... Where an application is uncontested, the Commission will be concerned with the fitness of an applicant and whether the applicant has met his *prima facie* showing of public need.

Under new section 10922(b)(1), once the applicant has made a *prima facie* showing that the proposed service would serve a useful public purpose, the burden of proof would shift to persons opposing issuance of the certificate to show that the proposed service is inconsistent with the public convenience and necessity. In other words, it creates a presumption that the grant of the application is consistent with the public convenience and necessity if the applicant demonstrates that the proposed service will serve a useful public purpose.[17]

Claxton, which has intervened in the proceeding before us, argues that the Division's findings in this case are supported by substantial evidence because there was sufficient evidence to make out a *prima facie* showing and the protestants' evidence was insufficient to rebut that showing. We disagree and determine that there was not substantial evidence to support a *prima facie* case that all of the broad authority sought would "serve a useful public purpose, responsive to a public demand or need."

Before the Motor Carrier Act of 1980, it was well-settled that an applicant seeking authority to provide transportation to many localities in a large geographical area was not required to demonstrate public convenience and necessity with respect to each point encompassed by the application. *Refrigerated Transport Co., Inc.*, 616 F.2d at 754. The applicant *was* required, however, to demonstrate need at numerous representative points. *Id.* Such a representative showing raised "a rebuttable presumption of a requirement for extended service at those points for which testimony is not available." *Miller Transporters, Inc.*, 594 F.2d at 466 (quoting *American Trucking Association, Inc. v. United States*, 373 F.Supp. 252, 256 (W.D.Tex.), *aff'd mem.*, 414 U.S. 1105, 94 S.Ct. 832, 38 L.Ed.2d 734 (1973)). The Commission could infer from an unrebutted showing of representative need that the need extended beyond the localities for which evidence was offered. *Refrigerated Transport Co., Inc.*, 616 F.2d at 754. No precise formula existed for determining whether a sufficiently representative showing of need had been made. *Id.* In reviewing the scope of authority granted on the basis of a representative showing, "the basic question ... [was] ... whether an inference of similarity throughout the area embraced by ... [applicant's] certificate could rationally be drawn from the evidence presented." *Id.* (quoting *May Trucking Co. v. United States*, 593 F.2d 1349, 1353 n.19 (D.C.Cir.1979)).

This Court has applied the representative need doctrine to applications filed after the effective date of the 1980 Act, *Refrigerated Transport Co.*, 673 F.2d at 1200, and the

---

**16.** H.Rep.No.96–1069, 96th Cong., 2d Sess. 13 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad.News 2283, 2295 [hereinafter cited as House Report].

**17.** House Report at 14–15, U.S.Code Cong. & Admin.News 1980, p. 2296.

Commission has recognized the doctrine's continuing vitality, *Art Pape Transfer, Inc., Extension—Commodities in End-Dump Vehicles,* 132 M.C.C. 84, 96 (1980). We find no indication that Congress intended to eliminate the requirement of a representative showing of public need or to lessen this particular burden previously imposed on applicants seeking geographically broad authority. It is true, as Claxton points out, that the House Committee report stated that an applicant was required to come forward only with "some" evidence of a public need or demand for the service. From this statement, Claxton argues that its showing of "some" need—*i.e.*, a need for service between the cities noted in Piggly-Wiggly's supporting statement—made out a *prima facie* case that the entire authority sought would serve "a useful public purpose, responsive to a public demand or need." In addressing the evidence required to make out a *prima facie* case, however, the Committee noted that the normal way to establish a useful public purpose has been through evidence of those who would use the service and that "this is still the most effective evidence, for it provides the Commission with the information it needs *to frame a grant of authority* and provides a factual framework for dealing with the application and the interests of parties on both sides."[18] Framing a grant of authority presumably includes framing it in territorial terms. To posit an extreme example, should an applicant seek nationwide authority, surely Congress did not intend the authority be granted where the evidence showed only a need between two cities. We therefore apply the representative need doctrine to determine whether substantial evidence supported the Division's finding that Claxton established a *prima facie* case.

■ The evidence submitted by Claxton to establish that the proposed service would serve "a useful public purpose, responsive to a public demand or need," related only to the handful of cities shown in Piggly-Wiggly's supporting statement which were in Pennsylvania and the five southeastern states of Georgia, Florida, Alabama, Tennessee and North Carolina. That evidence would be sufficient to make out a *prima facie* case of need only with respect to those cities and the area as to which those cities were representative. The authority granted by the Division, however, included a vast territory.[19] The evidence submitted was insufficient to support an inference of similarity throughout the area embraced by the broad grant. At best, the grant of authority should not have extended beyond those states identified by Piggly-Wiggly. Furthermore, the Division's grant included authority between *all points* in 33 states and the District of Columbia, on the one hand, and, on the other, *all points* in Georgia, even though, with the exception of Georgia, the evidence related only to a single city in the states identified by Piggly-Wiggly. This Court has previously held that evidence as to a need between two points in a single state is insufficient to support a grant including all points in the state as destinations. *Refrigerated Transport Co., Inc.,* 616 F.2d at 754–55. The evidence in this case is likewise insufficient to support inclusion of all points in the states as to which authority was sought.[20] Claxton failed to establish a *prima facie* case that

---

**18.** *Id.* at 14.

**19.** Aside from the states as to which evidence was submitted, the Division's grant of authority included authority between points in Arkansas, Connecticut, Delaware, Iowa, Illinois, Indiana, Kansas, Kentucky, Louisiana, Massachusetts, Maryland, Maine, Michigan, Minnesota, Mississippi, Nebraska, New Hampshire, New Jersey, New York, Ohio, Oklahoma, Rhode Island, South Carolina, Texas, Virginia, Vermont, Wisconsin, West Virginia, and the District of Columbia, on the one hand, and, on the other, points in Georgia.

**20.** It should be noted that the Commission has properly decided under the Motor Carrier Act of 1980 not to limit grants of authority to single points but to designate the authority in terms of counties and commercial zones. *American Trucking Associations, Inc. v. ICC,* 659 F.2d 452, 468, 473–74 (5th Cir. 1981). The full Commission adhered to this policy in Claxton's case in indicating the scope of authority it found justified by the evidence.

the broad authority sought would serve "a useful public purpose responsive to a public demand or need."[21] We therefore conclude that the Division's grant of authority was unsupported by substantial evidence.[22]

■ Though the full Commission, in reviewing the Division decision, first attempted to revoke Claxton's certificate and issue a more limited one, it subsequently decided it had no power to do so. Because of the disposition we make of this petition, we resist the understandable importunities of the parties that we set at rest the question as to whether the Commission had the power to revoke or modify the certificate on its own initiative under 49 U.S.C.A. § 10322(g)(1),[23] despite the specific revocation provision, 49 U.S.C.A. § 10925(b),[24] which is clearly inapplicable here. Whatever limits the statutory scheme may place on the Commission's power to take such action on its own initiative, we entertain no doubt as to our authority to direct the Commission to vacate or modify the improperly issued Claxton certificate or the Commission's authority to follow our directive on remand. *Cf. Central Power and Light Co. v. United States,* 634 F.2d 137, 155–56 (5th Cir. 1980) (holding the ICC had authority to reconsider certain rates following remand by the reviewing court after a determination on the merits notwithstanding a statutory five-year prohibition on reconsideration initiated by the Commission), *supplemented on rehearing,* 639 F.2d 1104 (5th Cir.), *cert. denied,* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 108 (1981); *Houston Lighting & Power Co. v. United States,* 606 F.2d 1131, 1143 (D.C.Cir.1979) (same), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980). To hold otherwise would require every party petitioning for review of an order granting a certificate to seek a stay of the issuance of the certificate since failure to obtain such a stay would render judicial review largely a pointless exercise. We perceive nothing in the statutory scheme imposing such a burden on parties petitioning for review or evidencing an in-

21. Citing the Commission's "Guidelines for the Processing of Opposed Cases" set forth in a statement accompanying the promulgation of final rules, Ex Parte No. 55 (Sub-No. 43), Rules Governing Applications for Operating Authority, 45 Fed.Reg. 86,771, 86,776 (1980), the Division concluded (1) Claxton had established, with respect to the entire authority sought, a *prima facie* case, which shifted the burden of proof to the protestants, and (2) the protestants failed to rebut the *prima facie* case. In reaching the first conclusion, the Division reasoned that publication of the notice in the Federal Register, under the Commission's guidelines, amounted to a threshold finding that Claxton had established a *prima facie* case of "a useful public purpose, responsive to a public demand or need" as to the entire authority sought and indicated that this finding must stand unless the protestants submitted evidence attacking the truthfulness of the applicant's evidence on which the threshold finding was based. Whether the Division correctly applied the guidelines is not entirely clear; the guidelines do not appear to limit the evidence submitted to dispel a threshold finding to matters of truthfulness nor to foreclose an appellate division from reconsidering the threshold finding. Petitioners do not claim that the Division misinterpreted the guidelines but rather that the threshold finding, as utilized by the Division, violates various procedural requirements. *See supra* note 12.

We see no need to address petitioners' arguments as to the validity, in a procedural sense, of the use of such a threshold finding. Whatever merit those arguments may have, we think it clear there must nevertheless be substantial evidence to support either (1) the ultimate finding that Claxton made out a showing of a public purpose, responsive to a public demand or need, for the broad authority sought or (2) the threshold finding that such a need existed, which formed the basis for the ultimate finding. We have found that the evidence was insufficient to support the Division's decision, whether expressed in terms of threshold or ultimate findings.

22. In addition to their contention that the evidence was too insubstantial to support the broad authority actually granted by the Division, petitioners argue that the evidence cannot support any grant of authority. We have determined only that the actual grant of authority was unsupported by substantial evidence. Though we do not disagree with the full Commission's statement in the decision served June 23, 1981, that the evidence supported a more limited grant, we leave the Commission free on remand to consider the matter anew in a manner not inconsistent with this opinion.

23. *See supra* note 11.

24. *See supra* note 10.

tent to restrict normal judicial review. *See Asbury Transportation Co. v. United States*, 236 F.Supp. 322, 325 (S.D.Cal.1964) (three-judge court) (Declining to preliminarily enjoin issuance of a certificate where the only irreparable harm claimed was that an issued certificate could not be nullified by a reviewing court, the court noted that the predecessor statutory revocation provision limited only the authority of the Commission and that the court's power over the certificate was "implicit in the congressional grant of review of the Commission's order that a certificate issue.").

Accordingly, we reverse the decision of Division 1 and remand this proceeding to the Commission with direction either to vacate or to modify the Claxton certificate on the basis of the present record or as supplemented in the exercise of its discretion.

REVERSED and REMANDED with direction and for further proceedings not inconsistent herewith.