RTC TRANSPORTATION, INC., and
Coastal Transport & Trading
Co., Petitioners,

v.

The INTERSTATE COMMERCE COMMISSION and The United States of
America, Respondents.

No. 82–8091.

United States Court of Appeals,
Eleventh Circuit.

June 27, 1983.

Alan E. Serby, Roger A. Kirschenbaum, Atlanta, Ga., for petitioners.

Richard J. Osterman, Jr., I.C.C., Susan J. Atkinson, Robert B. Nicholson, Asst. Chief, Neil R. Ellis, Appellate Section, Antitrust Div., Washington, D.C., for respondents.

Arthur J. Cerra, Kansas City, Mo., for intervenor Mid-America.

Before GODBOLD, Chief Judge, RONEY, Circuit Judge, and PITTMAN,* District Judge.

RONEY, Circuit Judge:

RTC Transportation, Inc. and Coastal Transport & Trading Co. petition for review of a decision of the Interstate Commerce Commission (ICC) which authorized Mid-America Express, Inc. to provide common carrier transportation of food and related products between a base area of Nebraska and Iowa and points in 24 eastern states. Docket No. MC–139434 (Sub-No. 12), *Mid-America Express, Inc., Extension-Food and Related Products* (February 4, 1982). Basing their challenge to the Commission's decision on the Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793 (1980) (amending the Interstate Commerce Act, 49 U.S.C.A. § 10101 *et seq.*), RTC and Coastal claim (1) Mid-America is not "fit, willing, and able" to transport all commodities within the description "food and related products," (2) the broad territorial authority granted is not responsive to a public demand or need, (3) the Commission failed to consider fully the interests of protesting carriers, and (4) the Commission should have made specific findings as to the effect of the grant on the national transportation policy. We affirm the Commission's grant of authority to Mid-America Express, Inc.

The application of Mid-America Express, Inc., filed in June 1981, was supported by the statement of Mid-America's president and the statement of one shipper, Farmland Foods, Inc., that Farmland would utilize Mid-America's service to ship its meat products from facilities in Iowa and Nebraska to customers in 24 states.[1] On July 22, 1981, the ICC published the application at 46 Fed. Reg. 37810 (1981), noting its preliminary finding that Mid-America had met its burden of proof under § 5(a)(3) of the Motor Carrier Act of 1980, 49 U.S.C.A. § 10922(b).

RTC, Coastal (a subsidiary of RTC), and a third carrier not involved in this appeal filed protests and evidence in opposition to the application. RTC alleged that an unrestricted grant to Mid-America would be "inconsistent with the public convenience and necessity," 49 U.S.C.A. § 10922(b)(1), because it would divert approximately 5% of RTC's shipping traffic, causing an increase in rates and a curtailing of service to small communities, contrary to the public interest. The matter was initially considered under "modified procedure" without oral argument by a Review Board of the ICC, which granted the authority requested by Mid-America. The Board concluded that Mid-America was fit, willing and able to perform the proposed service, and a public need for it had been established. The Board stated the protestants had failed to show the potential loss of traffic would impair their operations to an extent contrary to the public interest. The three protestants appealed that decision. Division 2 of the Interstate Commerce Commission, acting as an Appellate Division, affirmed the grant of authority. A Certificate of Public Convenience and Necessity was issued to Mid-America on February 4, 1982.

■ This Court has jurisdiction to review such final orders of the Interstate Commerce Commission under 28 U.S.C.A. § 2342(5) and 28 U.S.C.A. § 2321. In reviewing such orders, the Court must set aside agency determinations which are arbitrary, capricious, or unsupported by substantial evidence. 5 U.S.C.A. § 706(2)(A), (E). A decision is not arbitrary or capricious if the agency considers the relevant factors and articulates a rational connection between the facts found and the decision. *Watkins Motor Lines, Inc. v. ICC,* 641 F.2d 1183, 1188 (5th Cir.1981); *Refrigerated Transport Co., Inc. v. ICC,* 673 F.2d 1196,

---

* Honorable Virgil Pittman, U.S. District Judge for the Southern District of Alabama, sitting by designation.

1. The 24 state region included: Alabama, Connecticut, Delaware, Florida, Georgia, Indiana, Kentucky, Maryland, Maine, Massachusetts, Michigan, Mississippi, North Carolina, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, Virginia, and West Virginia.

1199 (11th Cir.1982). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. National Labor Relations Board,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Refrigerated,* 673 F.2d at 1199. "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966); *Refrigerated,* 673 F.2d at 1199.

■  The grant of a certificate of operating authority such as the one issued to Mid-America is governed by 49 U.S.C.A. § 10922(b)(1), which provides that the Commission

shall issue a certificate . . . if the Commission finds—

(A) that the person is fit, willing, and able to provide the transportation to be authorized by the certificate . . . and

(B) on the basis of evidence presented by persons supporting the issuance of the certificate, that the service proposed will serve a useful public purpose, responsive to a public demand or need;

unless the Commission finds, on the basis of evidence presented by persons objecting to the issuance of a certificate, that the transportation to be authorized by the certificate is inconsistent with the public convenience and necessity.

This section provides the substantive standards, and the burdens of proof. Once the applicant has made a showing that it is fit, willing and able to provide the service, and that the service proposed will serve a useful public purpose, the burden shifts to persons opposing issuance of the certificate to show that the proposed service is "inconsistent with the public convenience and necessity."

The first contention is that Mid-America and its supporting shipper, Farmland, did not present sufficient evidence to support the Commission's determination that Mid-America was "fit, willing, and able" to transport commodities within the "food and related products" description. RTC and Coastal do not challenge Mid-America's financial ability to provide the service, nor do they challenge its safety record or its compliance with Commission regulations. Rather, they argue Mid-America's authority should have been limited to meats, because its experience was in shipping meats and the support for this particular application came from Farmland, a shipper of pork products. "It presented no evidence describing the operation of its facilities or equipment placing it in a position to handle the vast variety of food products falling within the STCC classification other than meats."

■  The controlling legal question here is whether the applicant had to present specific evidence as to its ability to transport each and every product within the "food and related products" description. It clearly did not do that. It did not have to do so. It is sufficient to make a representative showing of fitness for the Commission to base a grant of authority to transport food and related products. *See Baggett Transportation Co. v. United States,* 666 F.2d 524 (11th Cir.1982) (applicants who had previous authority to transport similar commodities and owned equipment necessary to transport hazardous cargo were granted authority to transport various types of explosives); *Steere Tank Lines, Inc. v. ICC,* 675 F.2d 103 (5th Cir.1982) (authority granted although applicant did not yet have all the equipment needed for the authority sought). Mid-America made such a representative showing here.

There was evidence that Mid-America had extensive experience in the transportation of "meat and meat products." This commodity description was a broad classification including items such as chemicals, drugs, fertilizer, soap, and vegetable oils. A number of Mid-America's existing certificates had been expanded to permit the transportation of food and related products between points in two counties in Nebraska

and one county in Iowa and points in 18 of the eastern states involved here. Mid-America operates 25 tractors and 32 trailers, all suitable for the transportation of the involved commodities, and indicated a willingness to expand its fleet to meet the needs of its shippers.

Protestants rely on language in *American Trucking Associations, Inc. v. ICC*, 659 F.2d 452 (5th Cir. Unit A 1981), in which the Court stated that the Commission could not "assume that an applicant fit, willing, and able to carry one commodity in an STCC classification, is fit, willing, and able to carry all commodities in that classification." 659 F.2d at 472. *American Trucking*, however, concerned a Commission rule which mechanically required all applicants for new authority to use standard commodity classifications whether or not they actually wanted such broad authority. It did not concern an applicant such as Mid-America, seeking to support a broad grant of authority through evidence of its experience with a smaller, included group of commodities, and therefore does not conflict with the decision here.

Protestants' second claim is that the evidence does not show that the broad territorial grant to Mid-America will "serve a useful public purpose, responsive to a public demand or need," as required by 49 U.S.C.A. § 10922(b)(1)(B). Mid-America was granted what is known as radial authority to transport products between points in Nebraska and Iowa, on the one hand, and points in 24 eastern states on the other.

■ To satisfy its burden under 49 U.S.C.A. § 10922(b)(1), Mid-America had to make a "representative showing of public need." *See Deaton, Inc. v. ICC*, 693 F.2d 128, 130 n. 3 (11th Cir.1982); *Refrigerated Transport Co., Inc. v. ICC*, 686 F.2d 881, 887–88 (11th Cir.1982). It was not required to demonstrate a need for service at every point within the territory requested, but only at a representative number of points. *Refrigerated Transport Co., Inc. v. ICC*, 673 F.2d 1196, 1200 (11th Cir.1982). The legislative history of the Motor Carrier Act of 1980 explicitly recognizes shipper support as an effective way of establishing public need for a proposed service. H.R.Rep. No. 1069, 96th Cong., 2d Sess. 14, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2283, 2296. In this case the supporting shipper, Farmland, stated it would use Mid-America to transport its products from facilities at three points in Nebraska and seven points in Iowa to customers in 24 eastern states, tendering one to four truckloads a month or "as the traffic will bear." Farmland noted a shortage of refrigerated trailer equipment and its need for a carrier willing and able to make the multiple pickups and deliveries required by its customers.

■ Protestants would limit Mid-America's authority to transportation "between the facilities of the supporting shipper at the designated locations within Iowa and Nebraska or between the counties where those facilities are located on the one hand, and on the other points in those states where a true need is evidenced." The attempt to restrict the authority to Farmland's facilities is contrary to the Commission's generally applicable decision under the Motor Carrier Act of 1980 not to limit grants of authority to single points, but to designate authority in terms of counties and commercial zones. *See Refrigerated Transport Co., Inc. v. ICC*, 686 F.2d 881, 888 n. 20 (11th Cir.1982); *American Trucking Associations, Inc. v. ICC*, 659 F.2d 452, 468, 473–74 (5th Cir. Unit A 1981). *Cf.* 49 U.S.C.A. § 10922(h)(1)(B)(iv) (as to existing certificates, the Commission shall eliminate unreasonable or excessively narrow territorial limitations). As to limiting the grant to the specific counties where the three Farmland plants in Nebraska and seven in Iowa are located, there was sufficient representative evidence in this case for the Commission to infer that a grant of authority including the entire states of Nebraska and Iowa was justified. This Court has refused to engage in a "numbers game" to determine the minimum number of points needed to justify a grant at additional points. *See Deaton, Inc. v. ICC*, 693 F.2d 128, 130 (11th Cir.1982); *May Trucking Co. v. United States*, 593 F.2d 1349, 1353 (D.C.Cir.1979) ("[T]here is

no requirement that data on need and benefit be gathered for every village and hamlet in the area of proposed operations before a certificate of such encompassing scope may be awarded.").

As to the authorization to serve a 24-state area, there was evidence that Farmland planned to use Mid-America to serve its customers in these 24 states. Farmland stated that its tonnage throughout that territory has increased by approximately 20% each year. In light of this evidence, and the fact that Farmland customers may vary from time to time, the Commission could properly conclude that Mid-America should receive authority to serve the 24-state area without restriction as to specific destination points. We recognize that *Refrigerated Transport Co., Inc. v. ICC,* 686 F.2d 881, 888 (11th Cir.1982), held that the evidence is insufficient to support a grant including all points in the states where the only evidence presented relates to a single city in certain states. In this case, however, the evidence was not confined to single cities, and it showed that the shipper's requirements were increasing each year.

■ As the third issue on this appeal, RTC and Coastal argue the Commission failed to consider fully the interests of the protesting carriers. Under the 1980 Motor Carrier Act even after an applicant has made a showing of fitness and need, the Commission should not issue a certificate if the authorized transportation "is inconsistent with the public convenience and necessity." 49 U.S.C.A. § 10922(b)(1)(B).

The evidence presented by protestants in this case consisted mainly of economic data. RTC (independently) and Coastal (jointly with RTC) were authorized to provide the service Mid-America proposed. RTC believed Mid-America would solicit its accounts in Iowa and Nebraska, which included 35 shippers of foodstuffs during the first half of 1981. RTC stated it had suffered a 25% increase in empty mileage since 1980, and that the problem would be exacerbated by a grant of authority to Mid-America. RTC's witnesses testified that approval of Mid-America's application would result in diversion of 5% of its truckload traffic, causing rate increases of 10% or more above the rate of general inflation, and reduction in service to small and remote communities.

RTC and Coastal allege that the Commission did not consider or address this evidence. The Review Board's decision states:

Although protestant showed traffic subject to diversion, they do not show that loss of such traffic will impair their operations to an extent contrary to the public interest. We conclude that the benefits to be derived by shipper and the shipping public in general from the authority granted here outweigh any detriment, real or potential, to protestants.

Judicial review of such determinations by the Commission is narrow.

" . . . The court is not empowered to substitute its judgment for that of the agency." . . . The agency must articulate a "rational connection between the facts found and the choice made." While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–442, 42 L.Ed.2d 447 (1974) (citations omitted); *Refrigerated Transport Co., Inc. v. ICC,* 663 F.2d 528, 531 (5th Cir. Unit B 1981). Diversion of traffic from existing carriers is given less weight under the Motor Carrier Act of 1980 than previously. The burden of proof changed from applicant to protestant. Before the 1980 Act, the applicant had to show "public convenience and necessity," including whether its purpose "can and will be served as well by existing lines or carriers; and whether it can be served by applicant with the new operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest." H.R.Rep. No. 1069, 96th Cong., 2d Sess. 13, *reprinted in* 1980 U.S. Code Cong. & Ad.News 2283, 2295 (quoting *Pan-American Bus Lines Operations,* 1

M.C.C. 190, 203 (1936)). After the Motor Carrier Act, however, protestants have the burden of showing that the proposed grant is inconsistent with public convenience and necessity. Although diversion of traffic may be part of this showing, the Act specifically provides that in considering the effect of issuance on existing carriers, "the Commission shall not find diversion of revenue or traffic from an existing carrier to be in and of itself inconsistent with the public convenience and necessity." 49 U.S.C.A. § 10922(b)(2)(B).

In light of the narrow standard of review and the diminished importance of traffic diversion from existing carriers under the new Act, we cannot find that the Commission erred. There is no indication that the Commission failed to consider the evidence presented by the protestants or the relevant factors under the law. *See Baggett Transportation Co. v. United States,* 666 F.2d 524, 530 (11th Cir.1982).

 Protestants suggest that even if the Commission considered the impact on their operations from a grant of limited authority to serve Farmland Foods, it failed to consider that Mid-America would be able to serve other shippers as well. Although the Commission must consider the impact of a grant in all markets authorized by the certificate, the decision of the Review Board indicates that the Commission considered all the relevant markets in this case. The decision noted the scope of both RTC's and Coastal's operations which would be subject to competition with the authority granted to Mid-America.

One section of the Motor Carrier Act requires the Commission, in making a finding as to an applicant's fitness, to "consider and, to the extent applicable, make findings on at least the following: (A) the [National Transportation Policy] of section 10101(a) of this title [49 U.S.C.A. § 10101] ..."[2] 49 U.S.C.A. § 10922(b)(2)(A). RTC's and Coastal's final argument is that the Commission was required to make specific findings with respect to each of the concerns listed in the policy (needs of shippers, use of energy, allowance for adequate profits, etc.). This argument was rejected in *Baggett Transportation Co. v. United States,* 666 F.2d 524, 530–31 (11th Cir.1982). This Court stated that where the Commission had balanced the competing interests in the case, specific findings were not required. *See Alamo Express, Inc. v. ICC,* 673 F.2d 852, 860 (5th Cir.1982) ("[T]he ICC need not explicitly discuss in its decision each factor enumerated in § 10101. All that is necessary is that the essential basis for the ICC's rationale be clear enough so that a court can satisfy itself that the ICC has performed its function.") The administrative record here demonstrates that the Commission has performed its proper function in regard to the National Transportation Policy.

AFFIRMED.

---

2. The transportation policy, 49 U.S.C.A. § 10101, provides:

... it is the policy of the United States Government to provide for the impartial regulation of the modes of transportation subject to this subtitle, and in regulating those modes—

(7) with respect to transportation of property by motor carrier, to promote competitive and efficient transportation services in order to

(A) meet the needs of shippers, receivers, and consumers;

(B) allow a variety of quality and price options to meet changing market demands and the diverse requirements of the shipping public;

(C) allow the most productive use of equipment and energy resources;

(D) enable efficient and well-managed carriers to earn adequate profits, attract capital, and maintain fair wages and working conditions;

(E) provide and maintain service to small communities and small shippers;

(F) improve and maintain a sound, safe, and competitive privately-owned motor carrier system. . . .